**HUESTON HENNIGAN LLP**
Moez M. Kaba, State Bar No. 257456
*mkaba@hueston.com*
Rajan S. Trehan, State Bar No. 302242
*rtrehan@hueston.com*
Ashley M. Artmann, State Bar No. 319374
*aartmann@hueston.com*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FREEDOM FOR IMMIGRANTS,<br><br>*Plaintiff,*<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); CHAD F. WOLF, acting in his official capacity as Acting Secretary of DHS; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT ("ICE"); MATTHEW T. ALBENCE, acting in his official capacity as Acting Director for ICE; and DEREK N. BENNER, acting in his official capacity as Acting Deputy Director for ICE,<br><br>*Defendants.* | Case No.  2:19-cv-10424<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**INTRODUCTION**

1.     In 2013, Plaintiff Freedom for Immigrants ("FFI") created a free and confidential National Immigration Detention Hotline (the "Hotline") for persons in immigration detention to report abuse, find resources, and bridge the divide between detained persons and their family and loved ones.  FFI's Hotline was desperately needed.  FFI received between 600 and 14,500 calls per month from persons in immigration detention around the country, who called the Hotline at no cost.  The Hotline enabled FFI to monitor conditions in detention facilities and advocate on behalf of detained immigrants through legal action, political advocacy, and media coverage.  Detained immigrants used the Hotline to report instances of abuse and mistreatment at detention facilities around the country operating under the control and oversight of Defendant U.S. Immigration & Customs Enforcement ("ICE").  As a result of reports received via the Hotline, FFI was been able to draw attention to the physical and verbal abuse of detained persons, as well as ICE's failure to ensure the provision of necessary medical treatments.

2.     *Orange is the New Black* ("*OITNB*"), a popular Netflix show about life in U.S. prisons and immigration detention, prominently featured FFI's Hotline in Season 7 as a lifeline for those in detention.  After Season 7's national premiere in July 2019, dozens of media outlets covered FFI's work, and FFI spoke out about the medical neglect, labor exploitation, and sexual abuse happening in detention facilities.

3.     On the show, one *OITNB* character, Gloria Mendoza, provides another character potentially facing deportation, Maritza Ramos, with a four-digit telephone extension so she can contact FFI's Hotline for help.  Presciently, Gloria warns Maritza that, "You gotta be careful though. Apparently as soon as Big Brother figures out you're using the hotline, they shut it down."

4.     In the most perverse form of art imitating life imitating art, ICE did just as Gloria Mendoza warned: it prohibited persons in detention from free access to the

Hotline.  ICE's action occurred within two weeks of *OITNB*'s Season 7 premiere. This action was only the latest in a long history of retaliation against FFI for FFI's speech and advocacy against inhumane, illegal, and immoral treatment of persons in immigration detention.

5.    ICE's shutdown of the Hotline violates FFI's First Amendment rights to be free from retaliation for engaging in protected speech, and to speak freely to, and associate with, persons in immigration detention.  The shutdown also violates the First Amendment rights of detained immigrants, who, without the Hotline, either are unable to contact FFI at all or can only do so by paying exorbitant fees, as calls can cost upwards of $1 a minute.

6.    Just as the First Amendment protects the right to speak, so too does it guarantee that one will not be punished for exercising that right.  Frustrated as ICE may be that FFI is providing resources to immigrants and shining a light on otherwise hidden actions, Defendants may not punish FFI (or the immigrants they assist) for doing so.

7.    FFI seeks injunctive and declaratory relief to vindicate its First Amendment rights, and the First Amendment rights of persons in immigration detention, by declaring ICE's actions unconstitutional and reinstating the Hotline so that its vital work monitoring conditions in detention facilities and assisting detained immigrants may continue.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws and Constitution of the United States, including the First Amendment.  This Court has authority to grant declaratory relief under 28 U.S.C. § 2201.

9.    Venue is proper in this District under 28 U.S.C. § 1391.  A substantial part of the events giving rise to this action occurred in this District, as Plaintiff manages the Hotline out of its offices in Santa Monica, California.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**PARTIES**

10.     Plaintiff FFI, formerly known as Community Initiatives for Visiting Immigrants in Confinement ("CIVIC"), is a community-based 501(c)(3) non-profit organization based in California.  FFI runs the Hotline and supports a national network of visitation programs in immigration detention facilities.  It is also organized to disseminate ideas through the permissible, non-violent exercise of the rights of free speech guaranteed to it by the First Amendment to the United States Constitution.

11.     Defendant U.S. Department of Homeland Security ("DHS") is a department of the executive branch of the United States government that is tasked with, among other things, administering and enforcing the federal immigration laws.

12.     Defendant Chad F. Wolf is the Acting Secretary of DHS.  He is sued in his official capacity.

13.     Defendant ICE is the sub-agency of DHS that operates and oversees immigration detention facilities.

14.     Defendant Matthew T. Albence is the Acting Director for ICE.  He is sued in his official capacity.

15.     Defendant Derek N. Benner is the Acting Deputy Director for ICE.  He is sued in his official capacity.

**FACTUAL ALLEGATIONS**

16.     The United States immigration detention system detains upwards of 50,000 men and women in more than 200 detention facilities daily.[1]  For Fiscal Year 2018, ICE booked-in 396,448 persons into immigration detention, an increase of 22.5% over the previous year's 323,591 newly detained immigrants.[2]  Sixty percent

---

[1] ICE provides recent statistics on the number of immigrants who are detained.  *See Detention Management*, ICE, https://www.ice.gov/detention-management.  For example, as of November 9, 2019, a total of 47,260 immigrants were detained, and as of November 30, 2019, 44,860 immigrants were detained.

[2] *See Fiscal Year 2018 ICE Enforcement and Removal Operations Report*, ICE,

of those people are held in privately-run prison facilities, run by private prison companies such as GEO Group and Corrections Corporation of America/CoreCIVIC ("CCA/CoreCIVIC").[3]  ICE also detains immigrants in local jails and correctional facilities run by local law enforcement.

17.     Founded in 2012, FFI is a non-partisan, non-profit organization dedicated to ending the isolation of persons held in immigration detention and monitoring human rights abuses in detention facilities.  FFI monitors conditions in detention facilities through a free national telephone Hotline and a nationwide network of visitation programs.  Through person-to-person connections between persons in immigration detention and FFI's coalition of volunteers and members, FFI strives to transform state and community responses to migration so that immigrants are treated with dignity and are ensured the protections they are afforded under the Constitution and the law.

18.     FFI monitors detention conditions and gathers detained immigrants' information and stories through the Hotline and its national network of visitation programs.  This on-the-ground monitoring enables FFI to report abuse of persons in immigration detention and to shed light on detention conditions, including through legal action, political advocacy, and, significantly, media coverage.

### FFI's Prior Advocacy and ICE's Retaliatory Responses

19.     FFI established and coordinates a national visitation program network with visitation programs in 69 detention facilities across 26 states.  FFI both runs its own visitation programs and administers others in concert with local members of its network, such as Friends of Miami Dade Detainees ("FOMDD") and Friends of Adelanto Detainees.  Through FFI's network, over 4,500 visitor-volunteers meet

---

https://www.ice.gov/doclib/about/offices/ero/pdf/eroFY2018Report.pdf.

[3] *See* Livia Luan, *Profiting from Enforcement: The Role of Private Prisons in U.S. Immigration Detention*, Migration Policy Institute (May 2, 2018), https://www.migrationpolicy.org/article/profiting-enforcement-role-private-prisons-us-immigration-detention.

with immigrants in detention, usually on a weekly basis. These visitors are often the only consistent community connection for persons in ICE custody, most of whom do not have friends or family nearby. (In some instances, as has been well-reported, their families have been forcibly separated from them.) Visitation programs can lessen the emotional toll of confinement for persons in immigration detention by providing sustained community support.

20. ICE has repeatedly interfered with FFI's network of visitation programs in a retaliatory manner. On at least seven different occasions, ICE has terminated or suspended visitation programs in FFI's national network without warning or legitimate reason. Indeed, the only plausible explanation for ICE's actions is that ICE sought to punish FFI (and in turn the immigrants that it assists) for FFI's criticism of ICE and other officials involved in detention.

21. For example, in July 2013, FFI's co-founder, Christina Fialho, penned an FFI blog post and two articles in *The Huffington Post*, each of which was critical of immigration detention and ICE's poor administration of a deteriorating system.[4] The second article, entitled "Who is Overseeing Immigration Detention?", brought to light the mistreatment and verbal abuse of gay and transgender persons in immigration detention at the Santa Ana City Jail in Southern California. Fialho recounted her interviews with transgender persons who guards told to "use their male voice" and "act male" on an almost daily basis and who had experienced months-long delays to receive medication for hormone therapy, in violation of ICE's own detention standards. Within 48 hours of publication, without explanation, ICE's Los Angeles field office told organizations in FFI's visitation network that their visitation programs at the Santa Ana City Jail, James Musick Facility, and Adelaide Detention

---

[4] *See* Christina Fialho, *Detained U.S. Veteran on Hunger Strike at Eloy Detention Center*, The Huffington Post (July 8, 2013), https://www.huffpost.com/entry/john-ferron-hunger-strike_b_3544687; Christina Fialho, *Who is Overseeing Immigration Detention?*, The Huffington Post (July 22, 2013), https://www.huffpost.com/entry/who-is-overseeing-immigration-detention_b_3632009.

Facility ("Adelanto") were suspended until further notice.  When volunteers from FFI's network subsequently attempted to visit detained immigrants at Adelanto on July 26, 2013, they discovered that ICE also had created a blacklist of persons prohibited from visiting individuals at the facility that included FFI-affiliated volunteers.

22.    In FFI's conversations with ICE about ICE's suspension of FFI's visitation programs at Santa Ana City Jail, James Musick Facility, and Adelanto, Mr. Andrew Lorenzen-Strait, then-Deputy Assistant Director for Custody Programs and Community Outreach for ICE, informed FFI that ICE had shut down the visitation programs because of FFI's public statements criticizing ICE and immigration detention.  Incredibly, Lorenzen-Strait asked FFI to take down the "Who is Overseeing Immigration Detention?" article published by *The Huffington Post*. ICE's own words revealed its retaliatory motive.

23.    A similar pattern has played out many times since.  ICE has completely terminated or crippled FFI-affiliated visitation programs at Otay Detention Center in San Diego, California, Broward Transitional Center in Pompano Beach, Florida, Etowah County Detention Center in Gadsden, Alabama ("Etowah"), West County Detention Facility in Richmond, California, and T. Don Hutto Residential Center in Taylor, Texas.  These shutdowns, like the shutdown described above, occurred shortly after FFI and its members raised their voices to shed light on the abuses and conditions in detention facilities.  For example, on November 5, 2019, ICE suspended the FFI-affiliated visitation program at Etowah less than 48 hours after a peaceful protest outside the facility that included FFI members and volunteers.  A facility administrator specifically cited the protests outside the jail as the reason for the suspension.

24.    ICE has even taken retaliatory action against FFI after FFI filed formal complaints.  For example, on July 14, 2015, FFI filed an official complaint against ICE with the Department of Homeland Security's Office of Civil Rights and Civil

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Liberties ("CRCL") on behalf of detained immigrants at Etowah. The complaint alleged systemic and severe abuses, including physical assaults of detained immigrants to coerce them to sign removal documents and violations of medical and mental health care standards. Less than two weeks later, on July 27, 2015, ICE and the Etowah County Sheriff's Department terminated FFI's visitation program at Etowah. In late September 2015, after protests and media coverage of the shutdown, the Etowah County Sheriff finally notified FFI that they could again begin visiting detained immigrants at Etowah.

25. The vast majority of times that ICE has retaliated by shutting down FFI's speech or access, ICE later reversed course, but only after further protest and media attention. Even then, ICE has attempted to condition the reinstatement of visitation programs on FFI's relinquishment of its First Amendment rights. For example, ICE has attempted to condition restoration of FFI's visitation programs on restrictive confidentiality agreements that would force FFI volunteers to indemnify ICE from any liability "arising" out of the volunteers' work—language that would chill volunteers' ability to raise concerns about the conditions they encountered inside the detention facility.

## ICE's Retaliatory Shutdown of the Hotline

26. In 2013, FFI and FOMDD, a member of FFI's visitation network, made a formal proposal to ICE's national office requesting a telephone extension on ICE's national platform. In December 2013, ICE provided FFI the telephone extension number *9233# that operates as FFI's national Hotline. Since then, the Hotline has operated as a free and confidential phone line that persons in immigration detention can use to contact FFI from any of the more than 200 detention facilities around the country, all of which, on information and belief, operate under ICE's oversight and authority. The Hotline received between 600 and 14,500 calls per month, and FFI saw a massive uptick in calls following the 2016 presidential election, receiving over 11,000 calls and 10,000 calls in January and February 2017, respectively.

27.     FFI provides the Hotline number to persons in immigration detention through its network of visitation programs, as well as through legal service providers in areas without such programs.  Using dedicated, trained volunteers to answer Hotline calls, detained immigrants who reach the Hotline can report abuse and mistreatment and file complaints with CRCL, which in turn enables FFI to monitor detention conditions.  FFI also directly supports individuals in detention through an individualized case management and support system.  (FFI does not itself provide legal advice or representation through the Hotline.)

28.     The Hotline also helps detained persons reconnect with their loved ones. For example, Luis, a 57-year-old father from Central America, traveled to the California border with his wife and three children seeking asylum.  ICE separated Luis from his family and detained him in Northern California.  He called the Hotline uncertain of his own future and worried for his family's wellbeing.  Around that time, Luis's wife also reached out to FFI to seek the organization's assistance.  Using this information, FFI was able to let Luis and his wife know of each other's whereabouts.  FFI then raised funds to pay Luis's bond to release him from detention and for airfare to Texas to reunite him with his family.  FFI also connected Luis's family with a volunteer host family that provided them with a place to live.  Without the Hotline, this family may not have found each other in the sprawling and fractured immigration detention system.

29.     Importantly, the Hotline allows FFI to stay in contact with immigrants no matter where they are detained.  Detained immigrants are often transferred from facility to facility, making the free and nationwide Hotline an essential tool to maintain contact with people throughout the course of their detention.

30.     In November 2018, less than a week after FFI filed a letter with ICE and CRCL regarding the imposition of restrictions on a visitation program, ICE restricted free access to the national Hotline to seven detention facilities in Florida.  In an email on November 19, 2018, Peter Meitzner, Contract Support to Custody Management

Division for ICE, told FFI that the restriction was due to a "recently completed pro bono system audit." FFI and its members made multiple entreaties to ICE to restore the nationwide Hotline. This restriction also prompted 15 members of Congress to send ICE's Deputy Director a letter expressing their concern about ICE's restriction of the Hotline.[5]

31. On December 4, 2018, Julie Plavsic, a Senior Policy Advisor for ICE, sent an email stating that the Hotline had been restored at one additional facility in Florida and that the Hotline "will be considered for inclusion on lists outside of Florida on a case by case basis." Plavsic stated that a request for such inclusion could be made with "the name (and/or Alien ID) of the detainee, and the requesting facility." Given that the Hotline's effectiveness is closely tied to maintaining the confidentiality of its callers, FFI refused to provide the identifying information that ICE demanded (nor was it justifiable for ICE to request FFI to identify detained immigrants who sought the Hotline's assistance). On December 6, 2018, a follow-up email was sent to Plavsic again requesting that ICE restore the Hotline nationwide, this time offering a list of detention facilities from which FFI had received calls as proof of the Hotline's national reach. ICE did not respond to the request, and the Hotline remained restricted at every other detention facility except the eight ICE selected in Florida.

32. On July 26, 2019, Season 7 of *Orange is the New Black* ("*OITNB*") premiered on Netflix. In its first six seasons, *OITNB* focused on the lives of women in U.S. prisons. In Season 7, the show established new storylines centered around women in ICE custody, depicting the dire circumstances of persons in detention and the challenges they face in seeking assistance from those outside the detention

---

[5] *See* Attachment A to Letter from C. Fialho and C. Galaz Re: Notice to Cease & Desist Notice to Cease & Desist for Blocking Freedom for Immigrants' ICE Pro Bono Telephone Extension From Being Accessed Nationwide (Aug. 22, 2019), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5d5ee9fac5f736 000164e460/1566501374013/FFI_Letter.pdf.

facility's walls.  One of the season's lead characters, Maritza Ramos, is an immigrant woman in detention.  FFI worked with the creators and producers of *OITNB* to help depict life in detention and to promote the Hotline on the show.  As such, the show referenced FFI by name, highlighted its work helping persons in detention, and prominently featured the FFI Hotline.  The show makes clear that the Hotline is a four-digit extension that persons in detention can call for free, and characters are even shown accessing FFI's website to contact the Hotline.

33.   *OITNB* focused national attention on FFI's work, resulting in dozens of media outlets mentioning FFI and covering its work on behalf of detained immigrants, including *People Magazine*, *Salon.com*, *Vanity Fair*, *Vulture*, *The Hill*, and *Los Angeles Magazine*.  FFI used this attention to further the conversation around the abuses and conditions in immigration detention.  For example, FFI staff published an op-ed in *InStyle* highlighting the plight of a detained immigrant at Otay in limbo waiting for his prescription medication, as well as the high rates of sexual assault and allegations of forced labor violations at that detention facility.  *OITNB* executive producer Carolina Paiz also published an op-ed on *Buzzfeed* about her visit to Adelanto with FFI, describing the inhumanity of immigration detention.

34.   Within two weeks of *OITNB*'s premiere, on August 7, 2019, FFI stopped receiving calls on the Hotline from the eight facilities where ICE had not yet censored the Hotline.  FFI and FOMDD contacted ICE seeking an explanation.  On August 15, 2019, Felicia Johnson, a Contracting Officer's Representative for ICE, responded by email, copying Meitzner:

> The current ICE Detainee Telephone Service (DTS) provider is Talton Communications. Under Talton's contract with ICE, they have agreed to add Executive Office for Immigration Review (EOIR) approved pro bono attorney/organization telephone numbers to the pro bono platform and to delete those numbers that no longer appear on the EOIR approved list. This standardized process maintains the integrity of the DTS platform which is meant to provide detainees with pro bono phone access to vetted and legitimate pro bono legal assistance, while keeping paid calls at reasonable rates as specified in the contract.

If a pro bono legal entity is not on the EOIR approved list, they may follow the instructions at the following Department of Justice (DOJ) link to be vetted and added to the EOIR list: https://www.justice.gov/eoir/list-probono-legal-service-providers. Once the pro bono legal entity is included on the EOIR list and Talton is notified, they will be added to the DTS pro bono system. Note that the EOIR list is updated quarterly and pro bono providers must re-apply every three years. Entities no longer appearing on the EOIR list shall be removed from the DTS pro bono system.

Non-EOIR approved providers have the option to create a prepaid account to allow contact with the detainee(s) they are representing until such time that the provider is included on the EOIR approved list. If you have any further questions please feel free to contact (me) the Contracting Officer's Representative (COR), Ms. Felicia Johnson at Felicia.A.Johnson@ice.dhs.gov.

35.     At no point in time prior to Ms. Johnson's email had ICE ever indicated that FFI was required to appear on the EOIR-approved list in order to obtain or retain a telephone extension.  Nor has FFI ever appeared on that list—not in 2013 when ICE granted the telephone extension or in the years thereafter when ICE maintained the Hotline.  Moreover, upon information and belief, at least one organization not appearing on the EOIR list continues to operate an ICE-granted telephone extension.

36.     On information and belief, each of the Defendants participated in the decision to shut down the Hotline and/or took action to shut down the Hotline.

37.     On August 22, 2019, FFI sent ICE, Matthew T. Albence, Derek N. Benner, Johnson, and Meitzner a cease-and-desist letter explaining why ICE's stance, as communicated in Ms. Johnson's August 15, 2019 email, could not be reconciled with the agency's prior actions or statements.  FFI demanded that ICE reinstate FFI's telephone extension.  Later, on August 22, 2019, Ms. Johnson replied that ICE was "looking into th[e] matter" and would "respond shortly."

38.     Rather than respond to FFI, however, ICE attacked the organization in the press.  On August 26, 2019, *The Washington Post* published an article entitled

"'Orange Is the New Black' highlighted an immigrant hotline. Then ICE shut it down."[6]  In that article, in contrast to Ms. Johnson's e-mail, ICE spokesman Bryan Cox stated that FFI's telephone extension had been terminated because the "group engaged in prohibited conduct" by permitting three-way calls and call forwarding. Mr. Cox neither detailed the specific rules that FFI purportedly violated nor provided any evidence in support of his accusations.

39.    The Hotline remains shutdown and tens of thousands of persons in detention remain unable to access a critical resource.  As a way to mitigate these harms, but in no way address them fully, FFI has deposited money into phone accounts so that detained immigrants can continue to reach FFI.  Because phone calls can cost a detained person, who often does not have financial resources accessible in detention, upwards of $1 a minute, maintaining these accounts has come at significant financial cost to the organization, not to mention the time required to monitor the status of the accounts.  Managing these accounts has hindered FFI's ability to perform its mission.  Unfortunately, because FFI has been unable to fund each phone account, FFI has lost contact with many detained immigrants.  The Hotline shutdown thus interferes with FFI's work monitoring the abuses and conditions at detention facilities.

40.    ICE's censorship of the Hotline also interferes with detained immigrants' efforts to report abuse, seek assistance, and reconnect with their loved ones.

41.    ICE's shutdown of the Hotline has deprived FFI and detained immigrants of their confidential method of communicating with each other.  Prior to the shutdown, ICE never indicated to FFI that Hotline calls would be monitored, and FFI never received any warning that any Hotline call was being monitored.  But, on

---

[6] Meagan Flynn, *'Orange Is the New Black' highlighted an immigrant hotline. Then ICE shut it down.*, The Washington Post (August 26, 2019), https://www.washingtonpost.com/nation/2019/08/26/oitnb-ice-immigrant-hotline/.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

information and belief, since the shutdown, the paid phone accounts FFI must now use to speak with detained immigrants are monitored; FFI hears a pre-recorded message on each call indicating that the call is monitored and recorded.  FFI believes that the lack of confidentiality will deter detained immigrants from reporting abuse and seeking help, and FFI is concerned that its efforts on behalf of detained immigrants who call FFI may lead to even further retaliation by ICE.

42.    ICE's shutdown of the Hotline is the culmination of a years-long pattern of retaliatory harassment and interference.  ICE has repeatedly targeted FFI for its protected First Amendment speech and impeded FFI's work to support and advocate for detained immigrants across the country.  Without an order from this Court, ICE's violation of FFI's free speech rights will go unaddressed and FFI's work monitoring our nation's detention facilities will continue to be impeded or obstructed.  ICE's unconstitutional conduct harms not only FFI, but also immigrants, whose ability to contact FFI is hindered, and the public at large, who remain in the dark about what is happening inside our nation's detention facilities.

## CLAIMS FOR RELIEF

### COUNT 1

### Violation of the First Amendment – Retaliation

### (Against All Defendants)

43.    FFI repeats and realleges the preceding paragraphs as if fully set forth in this Count.

44.    FFI has engaged in speech protected by the First Amendment to the United States Constitution, including criticizing U.S. immigration detention, helping detained immigrants report and rectify abuses and poor conditions in immigration detention, mobilizing public sentiment towards demanding accountability by ICE, and urging government officials to change the immigration detention system.

45.    Defendants have taken prohibited adverse actions against FFI, namely, geographically restricting and then shutting down FFI's Hotline.  Because the

Hotline is the only way for FFI to maintain contact with many detained immigrants, is FFI's only method of speaking confidentially with detained immigrants, and is critical to FFI's work monitoring abuse against those immigrants, Defendants' shutdown of the Hotline would chill a person of ordinary firmness from continuing to engage in the protected activity.

46.    Defendants' adverse actions were motivated by their desire to retaliate against FFI for engaging in protected speech and were intended to chill FFI's protected speech.  Defendants shut down the Hotline immediately after *OITNB* publicized FFI's work and FFI spoke out critically about immigration detention through national media outlets.  Defendants had no legitimate reason to shut down the Hotline.  Before August 2019, Defendants had never conditioned FFI's use of the telephone extension on its appearance on the EOIR-approved pro bono list, and upon information and belief, other organizations continue to operate telephone extensions though they do not appear on that list.  Thus, to the extent there is any procedure or policy in place, Defendants have engaged in selective and retaliatory enforcement. This conduct fits squarely within a pattern of retaliatory conduct carried out by ICE against FFI for more than half a dozen years.

47.    Further, ICE's explanation for shutting down the Hotline has changed over time, thereby suggesting that ICE's explanations are insincere and pretextual.

48.    ICE's conduct constitutes unreasonable and unconstitutional interference with and infringement of FFI's exercise of its rights of free speech and free association under the First Amendment to the United States Constitution.

49.    Defendants' actions have caused and will continue to cause FFI irreparable injuries, including interfering with and infringing FFI's First Amendment rights, frustrating FFI's mission, and causing FFI to divert significant resources to engage with detained immigrants.

50.    As a result, this Court should declare that Defendants' actions targeting FFI based on its protected speech violated the First Amendment to the United States

Constitution, and enter a preliminary and permanent injunction reinstating the Hotline and enjoining Defendants from further interference with FFI's First Amendment rights.

## COUNT 2

## Violation of the First Amendment – Freedom of Speech and Freedom of Association

## (Against All Defendants)

51.    FFI repeats and realleges the preceding paragraphs as if fully set forth in this Count.

52.    FFI has engaged and continues to engage in protected speech and conduct, including, but not limited to, FFI's activism and advocacy on behalf of detained immigrants through legal action, political advocacy, and media coverage. FFI's advocacy depends on access to detained immigrants, who provide on-the-ground information regarding abuses and conditions in immigration detention.  FFI has and continues to associate with detained immigrants to discuss and receive information on conditions in detention facilities.  FFI continues its efforts to encourage greater numbers of detained immigrants to contact FFI and advocate for their rights.

53.    Defendants' decision to shut down FFI's Hotline because of its protected speech abridges FFI's ability to engage in protected speech, has significantly impeded FFI's ability to advocate its viewpoints, and has chilled FFI's right to speak freely under the First Amendment.  Defendants' shutdown of FFI's Hotline also directly and substantially interferes with FFI's right to associate with detained immigrants and has chilled FFI's freedom of association by obstructing FFI's access to detained immigrants and depriving them of a confidential method of communication with detained immigrants.

54.    Defendants' selective enforcement of the regulations relating to the provision of telephone extensions and its decision to shut down FFI's Hotline targets

speech based on its content, does not serve a compelling state interest, and is not narrowly tailored.

55.     Upon information and belief, Defendants shut down FFI's telephone extension because of the group's protected speech.  This impermissibly targets private speech based on the viewpoint of the speaker.

56.     Defendants' termination of FFI's telephone extension does not serve a compelling state interest unrelated to the expression of ideas and is not the least-restrictive means of regulating communication with detained immigrants.

57.     The conduct outlined above constitutes unreasonable and unconstitutional interference with and infringement of FFI's exercise of its rights of free speech and free association under the First Amendment to the United States Constitution.

58.     Defendants' actions have caused and will continue to cause FFI irreparable injuries, including interfering with and infringing FFI's First Amendment rights, frustrating FFI's mission, and causing FFI to divert significant resources to engage with detained immigrants.

## COUNT 3

### Violation of the First Amendment – Freedom of Speech and Freedom of Association

**(Against All Defendants on Behalf of Detained Immigrants)**

59.     FFI repeats and realleges the preceding paragraphs as if fully set forth in this Count.

60.     Detained immigrants have the Hotline to engage in protected speech and conduct, including, but not limited to, reporting abuse and mistreatment suffered in detention facilities.

61.     Detained immigrants depend on their association with FFI to engage in this protected speech, as FFI is often the only resource for them to report abuse at no cost to a non-governmental organization.

62.     Defendants' decision to shut down FFI's Hotline because of detained immigrants' protected speech abridges the detained immigrants' ability to engage in protected speech and to receive speech from FFI, has significantly impeded their ability to advocate on their own behalf, and has chilled their right to speak freely under the First Amendment.  Defendants' shutdown of FFI's Hotline also directly and substantially interferes with detained immigrants' right to associate with FFI and has chilled detained immigrants' freedom of association by obstructing their access to FFI and depriving them of a confidential method of communication to report abuse and seek help.

63.     Defendants' selective enforcement of the regulations relating to the provision of telephone extensions and its decision to shut down FFI's Hotline targets speech based on its content, does not serve a compelling state interest, and is not narrowly tailored.

64.     Upon information and belief, Defendants shut down FFI's telephone extension because of detained immigrants' protected speech in conversations with FFI, including speech exposing the mistreatment and abuse of detained immigrants. This impermissibly targets private speech based on the viewpoint of the speaker.

65.     Defendants' termination of FFI's telephone extension does not serve a compelling state interest unrelated to the expression of ideas and is not the least-restrictive means of regulating communication between detained immigrants and FFI.

66.     The conduct outlined above constitutes unreasonable and unconstitutional interference with and infringement of detained immigrants' exercise of their rights of free speech and free association under the First Amendment to the United States Constitution.

67.     Defendants' actions have caused and will continue to cause detained immigrants irreparable injuries, including interfering with and infringing their First

Amendment rights, frustrating their ability to report abuse and find loved ones, and causing them to incur significant personal expense to contact FFI from detention.

68.    FFI, which has developed a close relationship with thousands of detained immigrants through its visitation programs and the Hotline, brings this claim on behalf of detained immigrants, who face significant physical, financial, and institutional barriers, including a fear of retaliation and risk of deportation, to asserting their own rights.

## **PRAYER FOR RELIEF**

WHEREFORE, FFI respectfully requests that the Court enter judgment in its favor and:

a.  Enter a preliminary and permanent injunction enjoining and restraining ICE and its officers from further interference with FFI's and detained immigrants' exercise of their First Amendment rights;

b.  Enter a preliminary and permanent injunction reinstating FFI's national Hotline;

c.  Declare that Defendants' retaliation against FFI based on its protected speech violated the First Amendment;

d.  Award FFI attorneys' fees and costs of suit as permitted by law; and

e.  Order such further relief as the Court may deem just and proper.

Dated:  December 10, 2019              HUESTON HENNIGAN LLP


                                        By: _____
                                              Moez M. Kaba
                                              Rajan S. Trehan
                                              Ashley M. Artmann
                                              Attorneys for Plaintiff
                                              Freedom for Immigrants

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF