**HUESTON HENNIGAN LLP**
Moez M. Kaba, State Bar No. 257456
*mkaba@hueston.com*
Rajan S. Trehan, State Bar No. 302242
*rtrehan@hueston.com*
Ashley M. Artmann, State Bar No. 319374
*aartmann@hueston.com*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREEDOM FOR IMMIGRANTS,<br><br>       *Plaintiff*,<br><br>  vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>       *Defendants*. | Case No.   2:19-CV-10424<br><br>**NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION**<br><br>*[Filed concurrently with Declaration of Moez M. Kaba and Declaration of Christina Fialho]* |

## **NOTICE OF APPLICATION**

### **TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 13, 2020, or as soon thereafter as may be heard, in the United States District Court for the Central District of California, 350 W 1st St, Los Angeles, CA 90012, Plaintiff Freedom for Immigrants ("FFI") shall and hereby does move the Court pursuant to Federal Rule of Civil Procedure 65 for **a preliminary injunction** against Defendants U.S. Department of Homeland Security ("DHS"); Chad F. Wolf, acting in his official capacity as Acting Secretary of DHS; Immigration & Customs Enforcement ("ICE"); Matthew T. Albence, acting in his official capacity as Acting Director for ICE; Derek N. Benner, acting in his official capacity as Acting Deputy Director for ICE, and any other persons who are in active concert or participation with them (collectively the "Defendants") to:

> (1)    enjoin and restrain ICE and its officers from further interference with the operation of the free and confidential extension operated by FFI as a hotline for immigrants in detention; and
>
> (2)    restore FFI's free and confidential extension at all detention facilities operated, controlled, and/or overseen by ICE.

This application is based on this notice and supporting memorandum of points and authorities; the supporting affidavits of Christina Fialho and Moez M. Kaba; and any other written or oral evidence or argument as may be presented at or before the time this application is taken under submission by the Court.

Absent a preliminary injunction, FFI and immigrants in detention will suffer irreparable harm because Defendants will continue depriving FFI and immigrants of their First Amendment rights, as further outlined in FFI's supporting memorandum of points and authorities.

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 9

BACKGROUND .................................................................................................. 11

I.      FFI is Dedicated to Improving the Lives of Immigrants in
        Detention .................................................................................................. 11

II.     ICE Has a Pattern of Targeting FFI's Speech in a Retaliatory
        Manner ...................................................................................................... 14

III.    Defendants Obstructed FFI's Hotline in Retaliation for FFI's
        Public Speech and Advocacy .................................................................. 15

ARGUMENT ....................................................................................................... 19

I.      It is Highly Likely that FFI Will Succeed on the Merits .......................... 19

        A.     FFI is Likely to Prevail on its First Amendment Retaliation
               Claim ............................................................................................. 20

               1.      FFI engaged in protected First Amendment activity
                       prior to Defendants' retaliation ........................................ 20

               2.      ICE's shutdown of the Hotline would chill a person
                       of ordinary firmness from engaging in FFI's
                       protected activity .............................................................. 21

               3.      There is a sufficient nexus between FFI's protected
                       activity and Defendants' retaliation to infer a
                       retaliatory motive ............................................................. 23

        B.     FFI is Likely to Prevail on its other First Amendment
               Claims ............................................................................................ 26

               1.      First Amendment Right to Speak ..................................... 26

               2.      First Amendment Right to Receive Speech ..................... 28

               3.      First Amendment Right to Association ............................ 29

               4.      Defendants Cannot Satisfy Strict Scrutiny ..................... 29

                       a)      No Compelling Interest in Terminating the
                               Hotline .................................................................. 30

                       b)      Terminating the Hotline Not Narrowly
                               Tailored ................................................................ 31

II.     FFI and Detained Immigrants Will Suffer Irreparable Harm
        Without Injunctive Relief ........................................................................ 31

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

1

## <u>TABLE OF CONTENTS (cont.)</u>

2

<u>Page</u>

3    III.    The Balance of Equities and Public Interest Favor FFI ...................................32

4    CONCLUSION.........................................................................................................33

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

Page(s

**Cases**

*Allen v. Iranon*,
        283 F.3d 1070 (9th Cir. 2002).................................................................. 23, 24

*Alliance for the Wild Rockies v. Cottrell*,
        632 F.3d 1127 (9th Cir. 2011)....................................................................... 19

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
        559 F.3d 1046 (9th Cir. 2009)....................................................................... 19

*Arc of Cal. v. Douglas*,
        757 F.3d 975 (9th Cir. 2014).......................................................................... 19

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
        824 F.3d 858 (9th Cir. 2016)................................................................... 20, 22

*Arkansas Writers' Project, Inc. v. Ragland*,
        481 U.S. 221 (1987) ............................................................................... 27, 30

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
        457 U.S. 853 (1982) ............................................................................... 28, 29

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*,
        573 F. Supp. 2d 1291 (C.D. Cal. 2008)........................................................ 32

*Blair v. Bethel Sch. Dist.*,
        608 F.3d 540 (9th Cir. 2010).......................................................................... 20

*Brown v. Ent. Merchs. Ass'n*,
        564 U.S. 786 (2011) ....................................................................................... 31

*Cal. Motor Transp. Co. v. Truck'g,*
        *Unltd.*, 404 U.S. 508 (1972) .......................................................................... 21

*Chhoeun v. Marin*,
        306 F. Supp. 3d 1147 (C.D. Cal. 2018)........................................................... 9

*City of Lakewood v. Plain Dealer Pub. Co.*,
        486 U.S. 750 (1988) ....................................................................................... 27

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

<u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011)............................................................................ 31

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New*
   *York*, 447 U.S. 530 (1980).............................................................................. 27

*Coszalter v. City of Salem*,
   320 F.3d 968 (9th Cir. 2003)................................................................... 25, 26

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014).................................................................. 11, 32

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014)....................................................................... 32

*Edinger v. City of Westminster*,
   No. SA CV 14-0145-DOC(RNBx), 2015 WL 8770002 (C.D. Cal.
   Dec. 14, 2015) ............................................................................................. 24

*Ellins v. City of Sierra Madre*,
   710 F.3d 1049 (9th Cir. 2013).................................................................. 23, 24

*Elrod v. Burns*,
   427 U.S. 347 (1976) ...................................................................................... 31

*Fitzgerald v. El Dorado Cty.*,
   94 F. Supp. 3d 1155 (E.D. Cal. 2015)............................................................ 24

*Forsyth Cty., Ga. v. Nationalist Movement*,
   505 U.S. 123 (1992) ...................................................................................... 28

*Gibson v. United States*,
   781 F.2d 1334 (9th Cir. 1986).................................................................. 11, 20

*Healy v. James*,
   408 U.S. 169 (1972) ...................................................................................... 29

*Hyland v. Wonder*,
   972 F.2d 1129 (9th Cir. 1992).................................................................. 22, 23

*IBiz, LLC v. City of Hayward*,
   962 F. Supp. 2d 1159 (N.D. Cal. 2013) ......................................................... 32

## TABLE OF AUTHORITIES (cont.)

Page(s)

*In re Primus*,
436 U.S. 412 (1978) ....................................................................... 29

*Innov. Law Lab v. Nielsen*,
342 F. Supp. 3d 1067 (D. Or. 2018).................................................. 9

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009).................................................. 11, 31

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) ...................................................................... 28

*McCullen v. Coakley*,
573 U.S. 464 (2014) ...................................................................... 28

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ......................................................... 32

*N.A.A.C.P. v. Button*,
371 U.S. 415 (1963) ...................................................................... 29

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ................................................................ 26, 33

*Nw. Immigrant Rights Project v. Sessions*,
No. C17-716 RAJ, 2017 WL 3189032 (W.D. Wash. July 27,
2017).............................................................................. 9, 29, 31

*Perry v. Sindermann*,
408 U.S. 593 (1972) ................................................................. 9, 22

*Pinard v. Clatskanie Sch. Dist. 6J*,
467 F.3d 755 (9th Cir. 2006).......................................................... 22

*Ragbir v. Homan*,
923 F.3d 53 (2d Cir. 2019) ............................................................ 21

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ...................................................................... 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ............................................................ 26, 27, 28

## TABLE OF AUTHORITIES (cont.)

Page(s)

*Sammartano v. First Judicial Dist. Court,*
    303 F.3d 959 (9th Cir. 2002) .......................................................................... 32

*Saravia v. Sessions,*
    280 F. Supp. 3d 1168 (N.D. Cal. 2017) .......................................................... 9

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ................................................................................. 27, 30

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ...................................................................................... 21

*Soranno's Gasco, Inc. v. Morgan,*
    874 F.2d 1310 (9th Cir. 1989) ................................................. 11, 20, 21, 22

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ................................................................................. 27, 30

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ...................................................................................... 31

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n,*
    389 U.S. 217 (1967) ...................................................................................... 21

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) ...................................................................................... 28

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .......................................................................................... 19

**Regulations**

8 C.F.R. §§ 1003.61-.66 ........................................................................................ 25

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

## **INTRODUCTION**

The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  Yet that is precisely what Defendants did here.  Defendants cut off Plaintiff Freedom for Immigrants' ("FFI") free and confidential National Immigration Detention Hotline (the "Hotline")—and correspondingly deprived tens of thousands of persons in immigration detention an avenue to report abuse and mistreatment.  Defendants shut down the Hotline as part of a longer pattern of retaliating against FFI for drawing public attention to the conditions in which immigrants are held.  But precisely in such situations, where persons and entities are speaking on matters of public concern, is the need for robust First Amendment protections is at its zenith.  In the face of an executive branch whose hostility towards immigrants is unprecedented, Plaintiff has no option but to turn to the courts as the final bulwark against the violation of constitutional rights.  The Court should grant this preliminary injunction and order Defendants to reinstate FFI's Hotline and cease from further retaliatory acts.[1]

Since 2013, FFI's Hotline has served as a vital outlet for persons in immigration detention to report abuse, connect with resources, and bridge the divide between them and their loved ones.  As a result of reports received via the Hotline,

---

[1] Numerous courts have granted injunctive relief in response to the present administration's hostility towards immigrants.  *See, e.g.*, *Chhoeun v. Marin*, 306 F. Supp. 3d 1147 (C.D. Cal. 2018) (enjoining the removal of Cambodian citizens who were not afforded an adequate opportunity to challenge their detention or underlying orders of removal); *Innov. Law Lab v. Nielsen*, 342 F. Supp. 3d 1067 (D. Or. 2018) (ensuring adequate attorney visitation and telephone access for detained immigrants); *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) (requiring that minors in detention be afforded procedural due process protections), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018); *Nw. Immigrant Rights Project v. Sessions*, No. C17-716 RAJ, 2017 WL 3189032 (W.D. Wash. July 27, 2017) (enjoining the enforcement of a regulation that would burden nonprofit's ability to provide pro bono legal assistance to detained immigrants).

FFI has shone a light on physical, sexual, and verbal abuse of detained persons, as well as ICE's failure to ensure necessary medical and mental health treatments.  On August 7, 2019, without warning or justification, Defendants, who had granted FFI its toll-free Hotline, shut it down.

Though ICE has since provided vague and conflicting explanations for its decision to no longer provide fee and confidential access to the Hotline, its true motive was retaliation.  ICE shut down the Hotline just weeks after Netflix released the seventh and final season of its popular show *Orange is the New Black* ("*OITNB*"), a fictional show centered around the lives of incarcerated women.  The latest season introduced a new setting, an ICE detention center, and thanks in part to FFI's contributions to the show, provided a glimpse into the suffering endured by hundreds of thousands of immigrants detained in the U.S. each year.  It also depicted the need that persons in detention have for contact, information, and assistance from the outside world.  The series identified FFI by name and reflected the Hotline's role as a lifeline for those in detention.  Following the release of Season 7 of *OITNB*, media outlets brought FFI and its work to the forefront of an ongoing discussion regarding the nation's treatment of immigrants.  FFI used this platform to speak to a broad audience about systemic abuse and mistreatment at ICE-run detention facilities.  FFI's efforts did not go unnoticed.  Within two weeks of the release of Season 7, and following FFI's efforts to highlight the true stories of those suffering abuse in immigration detention, Defendants shut down the Hotline.

This is not the first time that ICE, its officials, and its agents have targeted FFI for its exercise of core First Amendment freedoms.  On multiple occasions, ICE has directly interfered with or suspended FFI's in-person visitation programs at detention facilities.  ICE's past retaliation coincided in time with FFI's public reporting of abuse and mistreatment at detention facilities, as well as its filing of formal complaints with government agencies.

Without FFI's (and others') efforts to shed light on the plight of persons in detention, those persons may suffer abuse, the public will not be able to hold their elected representatives accountable, and we all will be deprived of an important opportunity to discuss the morality of the conditions of immigration detention today.

Preliminary injunctive relief is needed and warranted.  FFI is highly likely to succeed on the merits.  Defendants' censorship of the Hotline is plainly "designed to retaliate against and chill political expression," which "strikes at the heart of the First Amendment."  *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (quoting *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).  The Hotline shutdown also violates FFI's and detained immigrants' First Amendment rights to speak freely to and associate with each other.  Without an injunction, those rights will continue to be violated and FFI will suffer irreparable harm.  *See Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009).  Moreover, restoring the Hotline, which operated for years prior to the shutdown, would pose little to no hardship to Defendants, and the public has a significant interest in seeing entry of an injunction upholding the First Amendment and promoting the free flow of information, particularly on such matters of public concern.  *See Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

## **BACKGROUND**

### I.    **FFI is Dedicated to Improving the Lives of Immigrants in Detention**

Immigration detention is a growing business.  ICE held more persons in immigration detention on the average day in 2018 than it has since 2001.[2]  As of mid-September 2019, ICE held almost 50,000 persons in immigration detention daily.

Detention systematically isolates immigrants from the outside world—they are separated from their families, transferred away from their communities, and often

---

[2] *See* Geneva Sands, *This year saw the most people in immigration detention since*

(Continued...)

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

face significant barriers just to contact family and attorneys, including exorbitant rates for telephone calls.  Detained immigrants lack control over their day-to-day lives and are often restricted from the most basic activities, such as reading and recreation.  Many suffer from depression, anxiety, PTSD, and suicidality.[3]

The harsh physical reality of detention exacerbates immigrants' isolation. Immigrants are often housed in overcrowded facilities that lack basic items like pillows and hygiene products.[4]  Medical and mental health care is substandard or worse, inhumane.[5]  Immigrants also face abuse motivated by hate, such as verbal harassment based on perceived race or gender identity, as well as sexual abuse, ranging from verbal harassment to rape.[6]  Complaints about these incidents are often ignored, or even worse the complaining party might be subjected to retaliation.

Social isolation, language barriers, and fear of retaliation contribute to a reluctance to report abuse and poor conditions, leaving detained immigrants highly vulnerable to mistreatment and abuse.[7]  These barriers mean much mistreatment and

---

*2001*, CNN (November 12, 2018), https://www.cnn.com/2018/11/12/politics/ice-detention/index.html.

[3] *See* Freedom for Immigrants, *Immigration Detention is Psychological Torture: Strategies for Surviving in Our Fight For Freedom*, (2019), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5db832af48dca06f693b7e87/1572352700752/FFI_MentalHealth.pdf.

[4] *See*, *e.g.*, Caitlin Dickerson, *"There is a Stench" Soiled Clothes and No Baths for Migrant Children at a Texas Center*, The New York Times (June 21, 2019), https://www.nytimes.com/2019/06/21/us/migrant-children-border-soap.html; *see also* Jennifer L. Costello, *Management Alert – DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley*, DHS Office of Inspector General (July 2, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19_.pdf.

[5] *See* Human Rights Watch and CIVIC, *Systemic Indifference: Dangerous & Substandard Medial Care in US Immigration Detention* (May 2017), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5a9da33f0d9297a1f84f60f2/1520280385430/HRW_Report.pdf.

[6] *See* FFI Decl. ¶ 11; Freedom for Immigrants, *Persecuted in U.S. Immigration Detention: A National Report on Abuse Motivated by Hate* (June 26, 2018), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5b3174e46d2a73f2d1f56aab/1529967847644/FFI_NatReportAbuse_062518.pdf.

[7] *See* National Prison Rape Elimination Commission, *National Prison Rape*

(Continued...)

abuse likely goes unreported and unnoticed.  Nor are there uniform legal standards to hold responsible parties accountable.[8]

Founded in 2012, FFI, formerly known as Community Initiatives for Visiting Immigrants in Confinement ("CIVIC"), is a non-profit organization dedicated to helping immigrants in detention.  FFI started by building a nationwide visitation network from the ground up.  From humble beginnings—coordinating visits to a single detention facility in California—FFI now coordinates visitation programs at 69 detention facilities, reaching thousands of detained immigrants.  Declaration of Christina Fialho (hereinafter "FFI Decl.") ¶ 4.  FFI's visitation programs permit detained immigrants to have meaningful personal contact with the outside world, thus easing the psychological distress they endure.  FFI volunteers go inside detention facilities to meet face-to-face with detained immigrants, many on a weekly basis.  *Id*. ¶ 5.  These meetings provide immigrants with a sense of stability in their chaotic lives, as volunteers develop relationships with immigrants and help them report abuse and access local resources when needed.  *Id*. ¶¶ 5, 9.  In turn, volunteers gather on-the-ground information to expose conditions and mistreatment that would otherwise be hidden from the public.  *Id*.

National and international press has focused on FFI's work to monitor and report on the human toll of ICE's mass detention policies.  *Id.* ¶ 11.  Over the years, FFI has used media outlets to spotlight examples of sexual abuse, medical neglect, hate speech, psychological torture, and mistreatment of detained immigrants.  *Id.* FFI also has published reports detailing the systemic nature of these problems using the stories of immigrants who FFI meets, such as a May 2017 report co-authored

---

*Elimination Report*, 21–24 (June 2009), https://www.ncjrs.gov/pdffiles1/226680.pdf.
[8] *See* ICE Detention Standards (February 24, 2012) https://www.ice.gov/factsheets/facilities-pbnds; John V. Kelly, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, DHS Office of Inspector General (January 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

1  with Human Rights Watch regarding dangerous and substandard medical care in

2  immigration detention.  *Id.*  Legislators have partnered with FFI to achieve change

3  through legislation.  FFI has now facilitated the passage of two California state bills

4  and a state budget amendment to stop the expansion of immigration detention and

5  phase out private immigrant prisons, as well as the introduction of two federal bills to

6  reunite separated families, implement community-based alternatives to immigration

7  detention, and establish a federal moratorium on immigration detention expansion.

8  *Id.* ¶ 12.

9  **II.    ICE Has a Pattern of Targeting FFI's Speech in a Retaliatory Manner**

10        It wasn't only journalists and lawmakers who noticed FFI's activism.  Over

11  the years, ICE, through its officials and agents, has repeatedly interfered with FFI's

12  programs without warning or justification.  The timing of ICE's actions makes clear

13  its retaliatory purpose: on multiple occasions, ICE terminated or restricted FFI or

14  FFI-affiliated visitation programs shortly after FFI publicized abuse or mistreatment

15  of immigrants or filed formal complaints against the agency.  For example, ICE

16  shuttered three visitation programs 48 hours after *The Huffington Post* published an

17  article written by one of FFI's co-founders, Christina Fialho.  *Id.* ¶ 13.  The article,

18  entitled "Who is Overseeing Immigration Detention?", decried ICE's

19  mismanagement of detention facilities and the abuse of transgender persons detained

20  at the Santa Ana City Jail.  Declaration of Moez M. Kaba (hereinafter "Kaba Decl."),

21  ¶ 2, Ex. 1.  When FFI representatives spoke with a then-DHS official, Andrew

22  Lorenzen-Strait, about the programs, he admitted that ICE shut them down because

23  FFI had publicly criticized the agency.  FFI Decl. ¶ 13.  Moreover, Mr. Lorenzen-

24  Strait proceeded to ask that FFI have *The Huffington Post* article taken down.  *Id.*

25        ICE engaged in similar retaliation against FFI-affiliated visitation programs at

26  six other detention facilities.  *Id*. ¶¶ 14-21.  In August 2014, an FFI visitation

27  program coordinator criticized immigration detention in testimony during a Florida

28  state congressional hearing, and a few days later ICE and its contracted partner shut

- 14 -

down her visitation program in Florida—only to reinstate the program a few days later. *Id.* ¶ 15.  Again, in early 2018 when FFI launched a media campaign to draw attention to a woman who had been sexually assaulted at an immigration detention facility in Texas, ICE responded by banning certain FFI and affiliated members from visiting immigrants at that facility. *Id.* ¶ 18.  And just last month, ICE suspended an FFI visitation program because of a peaceful protest that occurred outside the facility's walls less than 2 days earlier. *Id.* ¶ 21.

ICE has followed this pattern even when FFI formally petitions the government to address abuse and mistreatment of immigrants.  For example, in July 2015, FFI filed a formal complaint with DHS's Office of Civil Rights and Civil Liberties ("CRCL") on behalf of detained immigrants alleging systemic abuses at the Etowah County Detention Center in Alabama. *Id.* ¶ 16.  Two weeks later, ICE and local law enforcement responded by terminating FFI's visitation program. *Id.*  ICE relented later that year, but only after protests and critical media coverage regarding its actions. *Id.*  This pattern played out again in late 2017 and early 2018 when ICE and local law enforcement terminated FFI's visitation program at West County Detention Facility in California after FFI published a letter on behalf of detained women detailing inhumane conditions there, such as being denied access to bathrooms and being given biohazard bags to relieve themselves. *Id.* ¶ 17. Ultimately, ICE relented and reinstated the program after sustained public attention, including a letter to ICE from FFI and over eighty community groups. *Id.*

**III.** **Defendants Obstructed FFI's Hotline in Retaliation for FFI's Public Speech and Advocacy**

In addition to its visitation programs, FFI created a telephone hotline to extend the organization's reach and provide access to far more persons in immigration detention.  In 2013, FFI and Friends of Miami Dade Detainees ("FOMDD"), an FFI-affiliate, requested and received a telephone extension number (*9233#) that operates

1   on ICE's free and confidential national telephone platform.  *FFI Decl.* ¶ 6.  FFI used

2   that extension for its Hotline.  *Id.*

3        The Hotline significantly expanded FFI's ability to speak with detained

4   immigrants and vice versa.  Equipped with just a four-digit extension, detained

5   immigrants could reach FFI via a free and confidential phone call, throughout the

6   day, wherever they were detained.  *Id.* ¶ 7.  FFI used the Hotline to reach immigrants

7   at detention facilities without visitation programs, and to maintain contact with

8   immigrants even as they were transferred from facility to facility, which occurs

9   frequently.  *Id.*  FFI staff and trained volunteers answered Hotline calls and helped

10  detained persons report abuse, file formal complaints with CRCL, and connect with

11  resources.  *Id.* ¶ 9.  They also gathered information to assist FFI's efforts to monitor

12  the conditions of detention nationwide.  *Id.*  That the Hotline received as many as

13  14,500 calls a month speaks to its value, and as the numbers of detained immigrants

14  increased over the past three years, so did the number of calls.  *Id.* ¶ 8.

15       The Hotline was a vital resource for detained immigrants.  For example, Luis,

16  a 57-year-old father from Central America, traveled to the California border with his

17  wife and three children seeking asylum.  *Id.* ¶ 10.  ICE separated Luis from his

18  family and detained him in California.  *Id.*  He called the Hotline uncertain of his

19  own future and worried for his family.  *Id.*  Around that time, Luis's wife also

20  reached out to FFI for assistance.  *Id.*  Using this information, FFI was able to let

21  Luis and his wife know of each other's whereabouts.  *Id.*  FFI then raised funds to

22  pay Luis's bond and for airfare to Texas to reunite him with his family.  *Id.*  FFI also

23  connected Luis's family with a volunteer host family that provided them with a place

24  to live.  *Id.*  Without the Hotline, this family may not have found each other in the

25  sprawling and fractured immigration detention system.

26       FFI's Hotline, like FFI's visitation programs before it, soon drew ICE's

27  attention.  In November 2018, just days after FFI filed a letter with ICE and CRCL

28  regarding restrictions on one of its visitation programs, ICE restricted access to the

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

Hotline to just seven detention facilities in Florida (compared to the over 200 facilities nationwide accessible prior to November 2018).  *Id.* ¶ 22.  In a November 19, 2018 email, Peter Meitzner, Contract Support to Custody Management Division for ICE, stated that the restrictions resulted from a "recently completed pro bono system audit."  *Id.*, Ex. 2.  When FFI pressed further, Julie Plavsic, a Senior Policy Advisor for ICE, responded that the Hotline would be restored at one additional facility and that it would "be considered for inclusion on lists outside of Florida on a case by case basis" if FFI provided names and/or Alien IDs of detained persons requesting access at other facilities.  *Id.* ¶ 23, Ex. 3.  FFI refused to breach callers' confidentiality by providing the identifying information that ICE requested.  *Id.* ¶ 23.

To increase public knowledge of day-to-day life in detention and the work that organizations like FFI were doing (and for which additional support is needed), FFI worked with the writers and producers of *OITNB*, a popular Netflix show about life in U.S. prisons.  *Id.* ¶ 25.  Through this collaboration, Season 7 of *OITNB* portrayed the perils and plight of persons detained in ICE facilities and prominently featured FFI's Hotline as a critical lifeline.  *Id.*  The show depicts characters passing around information about FFI and the Hotline in secret to avoid the consequences of ICE learning about use of the Hotline.  As one character cautions another while sharing the Hotline number, "You gotta be careful though.  Apparently as soon as Big Brother figures out you're using the hotline, they shut it down."

*OITNB* not only predicted ICE's actual reaction but it amplified FFI's voice.  Press surrounding the season premiere focused on the immigrant-centric storylines and the organization's work.  *Id.*  One of the show's writers and producers authored a *BuzzFeed* piece in which she described FFI as "a fearless and resourceful nonprofit" that "monitors human rights abuses in detention and works with lawmakers to change legislation."  Kaba Decl. ¶ 3, Ex. 2 at 10.  On July 29, 2019, three days after the release of Season 7, FFI's Christina Fialho and Cynthia M. Galaz penned an editorial describing how *OITNB* "perfectly illustrated how hard it is for detained

1  people . . . to access help," and also drew attention to the abuse and neglect

2  characteristic of immigration detention facilities.  *Id*. ¶ 4, Ex. 3; FFI Decl. ¶ 25.  By

3  August 7, 2019, two weeks after Season 7's premiere, Defendants had shut down the

4  Hotline, and FFI stopped receiving calls altogether.  FFI Decl. ¶ 26.

5       FFI and FOMDD immediately sought an explanation from ICE as to why the

6  Hotline had been obstructed.  *Id*.  On August 15, 2019, Felicia Johnson, a

7  Contracting Officer's Representative for ICE, responded by implying that FFI had

8  been deleted from the system as part of a "standardized process."  *Id.*, Ex. 4.  Ms.

9  Johnson stated that ICE removed organizations from its free telephone platform who

10  did not appear on a list of legal service organizations approved by the Department of

11  Justice's Executive Office for Immigration Review ("EOIR"), but did not

12  specifically state that the Hotline had been blocked for this reason.  *Id.*  FFI sent

13  Defendants a cease-and-desist letter explaining, among other things, that ICE's

14  stance could not be reconciled with its prior actions or statements.  *Id*. ¶ 27, Ex. 5.

15  FFI has never appeared on the EOIR-approved list—not in 2013 when ICE granted

16  the telephone extension nor in the years thereafter that the Hotline operated.  *Id.* ¶ 26.

17  Though Ms. Johnson responded to FFI's letter by stating that ICE was "looking into

18  th[e] matter" and would "respond shortly," neither Ms. Johnson nor any other

19  defendant provided any further response to FFI.  *Id.* ¶ 27, Ex. 6.

20       However, ICE's public statements provided a different rationale for its

21  decision.  On August 26, 2019, *The Washington Post* published an article regarding

22  the Hotline shutdown in which ICE spokesman Bryan Cox stated that the Hotline had

23  been terminated because the "group engaged in prohibited conduct" by permitting

24  three-way calls and call forwarding.  Kaba Decl. ¶ 6, Ex. 6.  Mr. Cox identified no

25  specific rules that FFI purportedly violated and provided no evidence to support his

26  accusations, nor did FFI have an opportunity to respond before the shutdown.  *See id.*

27       The shutdown has forced FFI to shift limited financial and personnel resources

28  to maintain access to detained immigrants.  FFI's Hotline manager must spend hours

setting up and maintaining paid phone accounts at detention facilities, spending FFI's scarce resources on phone calls costing up to over $1 a minute.  FFI Decl. ¶¶ 28-29. Still, these efforts provide no solution for immigrants detained in facilities at which FFI has been unable to set up a prepaid phone account. *Id.* ¶ 29.  Moreover, FFI and detained immigrants can no longer speak confidentially, as their paid phone calls are monitored and/or recorded. *Id.* ¶ 30.  Even when FFI and immigrants can connect, they fear censorship and retaliation for communicating freely regarding abuse and detention conditions. *Id.*  It is this untenable situation, created by ICE's retaliation against and restriction of FFI and detained immigrants' protected First Amendment activities, that requires immediate relief to prevent further irreparable harm.

## **ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The Ninth Circuit evaluates these factors with a "sliding scale approach," such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011)).  FFI easily meets this standard.

## I.     It is Highly Likely that FFI Will Succeed on the Merits.

FFI's constitutional rights are being violated in at least two ways.  First, Defendants' decision to cut off access to the free and confidential Hotline violates FFI's rights to be free from retaliation in response to its protected speech.  Second, Defendants' conduct impermissibly burdens FFI's and immigrants' First Amendment

1  rights to speak, receive speech, and freely associate.  Either theory is sufficient to

2  grant relief, and FFI is likely to prevail on the merits of both.

3          **A.**    **FFI is Likely to Prevail on its First Amendment Retaliation Claim.**

4       Defendants censored the Hotline to retaliate against FFI for its work in

5  exposing and speaking out against abuses in immigration detention facilities

6  nationwide.  Such government action, which is "designed to retaliate against and

7  chill political expression strikes at the heart of the First Amendment." *Soranno's*

8  *Gasco*, 874 F.2d at 1314 (quoting *Gibson*, 781 F.2d at 1338); *see also Blair v. Bethel*

9  *Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) ("The First Amendment forbids

10  government officials from retaliating against individuals for speaking out.").

11       "To bring a First Amendment retaliation claim, the plaintiff must allege that

12  (1) it engaged in constitutionally protected activity; (2) the defendant's actions would

13  'chill a person of ordinary firmness' from continuing to engage in the protected

14  activity; and (3) the protected activity was a substantial [or] motivating factor in the

15  defendant's conduct—i.e., that there was a nexus between the defendant's actions

16  and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d

17  858, 867 (9th Cir. 2016).

18          **1.**    **FFI engaged in protected First Amendment activity prior to**

19                **Defendants' retaliation.**

20       FFI engaged in protected First Amendment activity by publicizing instances of

21  abuse and mistreatment in the press, drawing increased attention to these issues

22  through, and following, its featured role in Season 7 of *OITNB*, and by associating

23  with persons in detention.  Since its founding, FFI has been at the forefront of efforts

24  to uncover, verify, and document abuses at ICE detention facilities.  This includes

25  the filing of complaints with CRCL detailing how DHS investigated less than one

26  percent of 33,000 complaints of sexual and physical abuse against its component

27  agencies–including ICE, as well as publishing reports on ICE's systemic failure to

28  provide immigrants in detention with necessary medical care.  FFI Decl. ¶ 11.

Following the release of Season 7, FFI leaders wrote an op-ed highlighting forced labor violations and high rates of sexual assault at a particular detention facility, and also recounted ICE's history of retaliation against FFI.  *Id.* ¶ 25; *see also* Kaba Decl. ¶ 4, Ex. 3.  The First Amendment plainly protects this speech, which "comment[s] on the actions of government officials."  *Soranno's Gasco*, 874 F.2d at 1314.

The First Amendment interest is heightened here because FFI's advocacy addresses matters of public concern.  *See Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (citation omitted)).  Immigration, and more specifically the treatment of the increasing numbers of detained immigrants, is at the forefront of media attention and political dialogue.  *See Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019) ("Ragbir's speech implicates the apex of protection under the First Amendment.  His advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents.").  As such, FFI's activism "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *Snyder*, 562 U.S. at 452.

Additionally, FFI has engaged in distinct protected First Amendment activity by associating with detained immigrants and filing formal complaints on their behalf with DHS's CRCL.  *See* FFI Decl. ¶¶ 5, 9, 11, 16.  These activities, which implicate FFI's freedom of association and the right to petition for the redress of grievances, are "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967); *see also Cal. Motor Transp. Co. v. Truck'g Unltd.*, 404 U.S. 508, 510 (1972).

## 2. ICE's shutdown of the Hotline would chill a person of ordinary firmness from engaging in FFI's protected activity.

Defendants' actions would chill a person of ordinary firmness from continuing to engage in FFI's protected activity.  Because Defendants no longer provide free and confidential access to the Hotline, FFI spends significant sums maintaining paid

phone accounts to permit detained immigrants to continue to contact FFI at no cost.
FFI Decl. ¶¶ 28-29.  FFI staff spend hours monitoring and replenishing the accounts,
but FFI is unable to ensure that any detention facility's account always remains
funded and is unable to establish an account at each of the over 200 detention
facilities nationwide.  *Id.*  Thus, many detained immigrants may not be able to
contact FFI at all, and FFI shoulders mounting costs to ensure that as many as
possible can.  The Hotline shutdown has a chilling effect because it forces FFI to
divert its limited financial and personnel resources from focusing on the
organization's core mission of assisting immigrants in detention.  *See id.*; *see also*
*Ariz. Students' Ass'n*, 824 F.3d at 868 (noting that "[b]oth the Supreme Court and
[the Ninth Circuit] have recognized" that the "government may chill speech by
threatening or causing pecuniary harm" (citation omitted)).  Defendants' conduct
sends a broader message that organizations who scrutinize and monitor the
government are more likely to be subject to adverse treatment.  *Pinard v. Clatskanie*
*Sch. Dist. 6J*, 467 F.3d 755, 771 (9th Cir. 2006) ("[D]efendants' suspension of the
plaintiffs would lead ordinary student athletes in the plaintiffs' position to refrain
from complaining about an abusive coach in order to remain on the team.").

Nor can Defendants escape First Amendment scrutiny by asserting that the
extension that they granted FFI in 2013 is a government benefit that Defendants
could revoke at their pleasure.  The government cannot "deny a benefit to a person
because of his constitutionally protected speech or associations."  *Hyland v. Wonder*,
972 F.2d 1129, 1136 (9th Cir. 1992) (quoting *Perry*, 408 U.S. at 597).  Ninth Circuit
law is unambiguous on this point.  In *Soranno's Gasco*, the plaintiffs, who were the
officers and sole shareholders of a petroleum products company, had publicly
criticized the defendant county and air pollution control district for aspects of their
pollution-control regulations.  874 F.2d at 1312.  A few months later, the pollution
control district sent a letter to the company's customers informing them that the
company's permits were suspended and that they could no longer legally sell

gasoline.  *Id.* at 1313.  Reversing the district court's grant of summary judgment to the defendants, the Ninth Circuit held that, regardless of whether the plaintiffs could "establish a legally protected interest in the permits themselves," the plaintiffs were entitled to relief if they could establish the permits had been revoked in retaliation for the exercise of their First Amendment rights.[9]  *Id.* at 1314.  In *Hyland*, the Ninth Circuit extended this same logic to the retaliation claim of an at-will volunteer who had been dismissed after penning a memorandum criticizing the treatment of detainees at a juvenile hall.  *Hyland*, 972 F.2d at 1136 ("That Hyland had no right, in the first instance, to serve as a volunteer and that he could have been terminated at will does not diminish his First Amendment claim.").

### 3.   There is a sufficient nexus between FFI's protected activity and Defendants' retaliation to infer a retaliatory motive.

The timing of Defendants' termination of the Hotline, their pattern and history of retaliating against FFI because of its protected activity, and the pretextual and conflicting explanations they offered for their decision, establish that FFI's protected activity was a substantial or motivating factor for Defendants' retaliation.  *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1062-63 (9th Cir. 2013) (holding this type of "circumstantial evidence" sufficient to establish retaliatory motive); *see also Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002) (same).

Courts have held that a plaintiff can establish retaliatory motive by showing the "proximity in time" between protected activity and retaliatory action.  *Allen*, 283 F.3d at 1078.  When ICE initially restricted the Hotline to seven facilities in Florida in November 2018, it did so within a week of FFI submitting a complaint to CRCL regarding ICE's imposition of restrictions on an FFI visitation program.  FFI Decl. ¶ 22.  When ICE completely shut down the Hotline in August 2019, it did so within

---

[9] As discussed below, however, FFI and detained immigrants do possess a legally cognizable First Amendment interest in the Hotline.  *See infra* §§ IV.B.1-3.

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

1   two weeks of *OITNB*'s premiere and FFI's contemporaneous public criticism of ICE.

2   *Id.* ¶ 26.  This timing supports a very strong inference that Defendants retaliated

3   against FFI.  *See Allen*, 283 F.3d at 1078 (finding inference of retaliation based on

4   eleven-month gap and noting that the inference "would have been stronger had the

5   gap in time been smaller"); *Ellins*, 710 F.3d at 1062 (noting that "three to eight

6   months is easily within a time range that can support an inference of retaliation").

7       Defendants' pattern and history of targeting FFI and its affiliates for their

8   protected activity further establishes retaliatory motive.  ICE and its agents have

9   repeatedly terminated or suspended the visitation programs in FFI's national

10  network.  FFI Decl. ¶¶ 13-21.  As is the case with the recent Hotline shutdown, this

11  past interference has often followed close in time to specific speech or petitioning

12  activity, including the filing of formal complaints with CRCL.  *See id.*  Moreover,

13  when FFI spoke with ICE after it suspended three FFI visitation programs in 2013,

14  an ICE official requested that FFI take down an article criticizing the agency that had

15  been published by *The Huffington Post* shortly before ICE suspended the programs.

16  *Id.* ¶ 13.  Then and now, ICE has made little effort to mask its retaliatory motive.

17  *See Allen*, 283 F.3d at 1077 & n.6 (noting that "expressed opposition" to protected

18  speech is evidence of retaliation and describing defendant's complaint regarding

19  personnel "going to the media" as such evidence).

20      Defendants' shifting, inconsistent explanations also demonstrate that their

21  justifications for the Hotline shutdown are pretextual and that their true motive is to

22  target FFI's protected activity.  *See Edinger v. City of Westminster*, No. SA CV 14-

23  0145-DOC(RNBx), 2015 WL 8770002, at *15 (C.D. Cal. Dec. 14, 2015) ("A

24  plaintiff can demonstrate pretext by showing weaknesses, implausibilities,

25  inconsistencies, incoherencies, or contradictions in the employer's . . . reasons for its

26  action, which a reasonable fact finder could rationally find . . . unworthy of

27  credence." (quoting *Fitzgerald v. El Dorado Cty.*, 94 F. Supp. 3d 1155, 1167 (E.D.

28  Cal. 2015) (internal quotation marks omitted))).  In an August 15, 2019 email, Ms.

1   Johnson of ICE attributed the shutdown to a "standardized process" whereby ICE's

2   service provider "delete[d] those numbers that no longer appear on the EOIR

3   approved list."[10]  FFI Decl. ¶ 26, Ex. 4.  But ICE did not grant FFI the free and

4   confidential extension on the condition that FFI appear on an EOIR list, nor has FFI

5   ever appeared on such a list.  *Id.* ¶ 26.  Moreover, FFI is aware of at least one other

6   organization that continues to operate a free and confidential extension on ICE's

7   platform despite not appearing on the EOIR list.  *See id.*; *see also Coszalter v. City of*

8   *Salem*, 320 F.3d 968, 978 (9th Cir. 2003) ("A reasonable fact finder could find from

9   the inconsistent application of the cellular phone policy that the defendants'

10  motivation for enforcing the policy (if there even was such a policy) against [the

11  plaintiff] was retaliation for his constitutionally protected speech.").

12      Nor can Ms. Johnson's explanation be squared with that offered by her

13  colleagues.  In an August 26, 2019 article in *The Washington Post*, ICE spokesman

14  Bryan Cox did not attribute ICE's shutdown of the Hotline to any "standardized

15  process," but rather alleged that ICE terminated FFI's extension because the "group

16  engaged in prohibited conduct" by permitting three-way calls and call forwarding on

17  its extension.[11]  Kaba Decl. ¶ 6, Ex. 6 at 32.  Mr. Cox neither cited relevant

18  prohibitions nor detailed any evidence to support his claim.  Defendants' inability to

19  explain the basis for their actions in a consistent manner supports FFI's claim that the

20

21  ───────────────

21  [10] In order to appear on EOIR's List of Pro Bono Legal Service Providers, a non-
22  profit must attest that it has at least one attorney or fully accredited representative
    eligible to practice law who has registered with EOIR, and commit to providing at
23  least 50 hours a year of pro bono legal services in each immigration court where the
24  organization intends to be listed.  *See* 8 C.F.R. §§ 1003.61-.66.  FFI would need to
    add a significant number of lawyers to its staff in order to meet the hours
25  maintenance requirements in each jurisdiction with an immigration court. Because
26  the provision of direct legal services is not part of FFI's primary mission, it has not
    made those outlays or applied for this status, nor should it have to.  FFI Decl. ¶ 26.
27
    [11] ICE provided a similar statement from Mr. Cox to *The Daily Caller*, a conservative
28  news blog.  Kaba Decl. ¶ 5, Ex. 5 at 30.

1 proffered justifications are pretext for their true, prohibited, retaliatory motive.  *See*

2 *Coszalter*, 320 F.3d at 978 ("[A] pretextual explanation such as this one casts doubt

3 on other explanations that, standing alone, might appear to be true.").

4        **B.**     **FFI is Likely to Prevail on its other First Amendment Claims.**

5       Beyond their impermissible retaliation, Defendants' shutdown of FFI's

6 Hotline also runs afoul of the First Amendment because it restricts, or at a minimum,

7 significantly burdens FFI and detained immigrants': (1) protected speech based on

8 content and viewpoint; (2) right to receive speech; and (3) right to associate.  These

9 First Amendment violations cannot satisfy strict scrutiny, and this provides an

10 independent basis for the Court to grant the relief sought.

11             **1.**     **First Amendment Right to Speak**

12       First, FFI and detained immigrants hold a First Amendment interest in

13 speaking with each other.  The First Amendment "was fashioned to assure unfettered

14 interchange of ideas for the bringing about of political and social changes desired by

15 the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (citation

16 omitted).  A primary component of FFI's mission is supporting detained immigrants.

17 *See* FFI Decl. ¶¶ 5, 9.  For FFI to connect detained immigrants to the appropriate

18 resources, it must first speak with those in detention.  Similarly, detained immigrants

19 have a First Amendment right to speak with FFI.  Immigration detention is isolating.

20 Many detention facilities are in remote areas, and the costs of standard phone calls

21 can be prohibitive. *Id.* ¶¶ 5, 29.  Without the free Hotline, detained immigrants may

22 not be able to reach FFI at all.

23       Defendants' shutdown of the Hotline singles out FFI and detained immigrants'

24 speech for differential treatment based on the viewpoint of their speech.  "It is

25 axiomatic that the government may not regulate speech based on its substantive

26 content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of

27 Va.*, 515 U.S. 819, 828 (1995).  "When the government targets not subject matter, but

28 particular views taken by speakers on a subject, the violation of the First Amendment

is all the more blatant." *Id.* at 829. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

Years of successful operation prove that the Hotline helps expose serious human rights abuses in ICE's detention facilities. Because of these shortcomings, FFI advocates for abolishing immigration detention. Defendants may find this offensive, but this viewpoint is no basis for burdening speech. That Defendants continue to permit other organizations, including at least one not appearing on the EOIR list, to operate extensions on ICE's free telephone platform furthers the inference of viewpoint discrimination.[12]  FFI Decl. ¶ 26; *see City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 763 (1988) ("[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship.").[13]

Defendants may defend their actions by asserting that they did not entirely block access to the Hotline but instead made it more difficult for FFI and detained immigrants to connect. *See* FFI Decl. ¶ 26, Ex. 4. But this is no defense at all. Defendants have made it more costly and more dangerous for detained immigrants to speak to FFI. Each constitutes a cognizable burden on speech.

The law is settled that the government cannot "impose[] a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members*

---

[12] If Defendants were to terminate all extensions used for reporting abuse and mistreatment at detention facilities, that would be an impermissible content-based restriction. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987) ("[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." (quoting *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537 (1980))).

[13] The risks of such discrimination are particularly high where, as here, "the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood*, 486 U.S. at 763.

1    *of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991); *see also Sorrell v. IMS*

2    *Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted

3    speech by burdening its utterance than by censoring its content."); *Rosenberger*, 515

4    U.S. at 828.  Here, ICE burdens FFI's use of a free Hotline, which ICE granted, to

5    suppress "ideas thought inimical to [their] own interest." *Legal Servs. Corp. v.*

6    *Velazquez*, 531 U.S. 533, 549 (2001).  "Speech cannot be financially burdened . . .

7    simply because it might offend a hostile mob," thus it certainly cannot be financially

8    burdened simply because it might offend the government. *Forsyth Cty., Ga. v.*

9    *Nationalist Movement*, 505 U.S. 123, 134-35 (1992).

10       Apart from imposing an impermissible financial burden, ICE is encumbering

11   FFI's and immigrants' First Amendment rights by preventing confidential speech.

12   When FFI speaks to a detained immigrant on a paid call, a recording plays informing

13   the call's participants that it is being recorded. *See* FFI Decl. ¶ 30.  Detained

14   immigrants and FFI's volunteers must account for the loss of confidentiality when

15   deciding in what speech to engage.  Because of the sensitive nature of FFI's work,

16   the inability to confidentially discuss abuse constitutes a significant burden on

17   speech. *See id.*; *McCullen v. Coakley*, 573 U.S. 464, 487 (2014) (holding buffer

18   zones "impose serious burdens" because they deprived plaintiffs from engaging in

19   "close, personal conversations that they view as essential" to their work).

20           **2.       First Amendment Right to Receive Speech**

21       Second, it is well established that "the Constitution protects the right to receive

22   information and ideas." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v.*

23   *Pico*, 457 U.S. 853, 867 (1982) (citation omitted); *see Richmond Newspapers, Inc. v.*

24   *Virginia*, 448 U.S. 555, 576 (1980) (plurality opinion).  Where a willing speaker

25   exists, as is the case here, the First Amendment's protections are afforded "to the

26   communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy*

27   *v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).  Because

28   Defendants have restricted FFI's and detained immigrants' right to speak, they also

1  have restricted their corresponding right to receive information from each other.

2  Indeed, it is critical to FFI's mission to receive detained immigrants' speech

3  concerning abuse and detention conditions, and it is critical for immigrants to receive

4  information regarding needed services and their loved ones.  FFI Decl. ¶¶ 5, 7, 9-10.

5  Because the right to receive speech is no less protected than the right to speak,

6  Defendants must satisfy strict scrutiny.  *See Pico*, 457 U.S. at 867; *N.A.A.C.P. v.*

7  *Button*, 371 U.S. 415, 438 (1963) ("[O]nly a compelling state interest . . . can justify

8  limiting First Amendment freedoms.").

9  ### 3.    First Amendment Right to Association

10  Finally, FFI's operation of the Hotline comes within "the generous zone of

11  First Amendment protection reserved for associational freedoms."  *In re Primus*, 436

12  U.S. 412, 431 (1978).  There is no doubt that the Hotline shutdown suffocates a

13  primary means of association for FFI and detained immigrants.  FFI Decl. ¶¶ 7-10;

14  *see Healy v. James*, 408 U.S. 169, 181-82 (1972) (holding that organization's

15  "associational interests . . . were circumscribed by the denial of the use of campus

16  bulletin boards and the school newspaper," as well as the inability "to hold a meeting

17  in the campus coffee shop because they were not an approved group").[14]

18  Defendants' infringement of FFI's and detained immigrants' associational freedoms

19  is subject to strict scrutiny, *In re Primus*, 436 U.S. at 432; *Nw. Immigrant Rights*

20  *Project v. Sessions*, No. C17-716 RAJ, 2017 WL 3189032, at *3-4 (W.D. Wash. July

21  27, 2017), and for the reasons that follow, Defendants cannot satisfy this standard.

22  ### 4.    Defendants Cannot Satisfy Strict Scrutiny

23  Because Defendants are burdening First Amendment rights based on the

24  content and views expressed, Defendants' action is presumptively unconstitutional

25

26  [14] As noted above, the right to petition the government for redress of grievances is

27  closely tied to the right of association.  Given that FFI used the Hotline to gather

information in support of formal complaints filed with CRCL, Defendants' actions

28  abridge this related constitutional right too.  *See supra* § IV.A.1.

1 and Defendants "must show that [their action] is necessary to serve a compelling
2 state interest and is narrowly drawn to achieve that end" to justify their shutdown of
3 the Hotline. *Simon & Schuster*, 502 U.S. at 118 ("In order to justify such differential
4 treatment, 'the State must show that its regulation is necessary to serve a compelling
5 state interest and is narrowly drawn to achieve that end.'" (quoting *Arkansas Writers'*
6 *Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987))); *Sorrell*, 564 U.S. at 565
7 (applying strict scrutiny to a law that "disfavors specific speakers").  Defendants can
8 do neither.

9         **a)     No Compelling Interest in Terminating the Hotline**

10      Defendants can point to no compelling interest in eliminating FFI's free and
11 confidential extension from the ICE platform.  Indeed, it is unclear that the Hotline's
12 shutdown is rooted in any policy, much less a reasoned one.  As already noted,
13 Defendants have offered inconsistent and shifting explanations for the shutdown, and
14 none of those explanations cited a specific statutory or administrative provision.

15      The first of Defendants' explanations—that ICE shut down the Hotline
16 because FFI does not appear on the EOIR list of approved legal service
17 organizations—does not constitute a compelling interest.  FFI does not provide
18 individual legal representation for detained immigrants, so there is no logic in
19 subjecting FFI to requirements established to regulate the provision of legal services.
20 *See supra* note 10.  FFI has never appeared on the EOIR list during the years it
21 operated the Hotline.  FFI Decl. ¶ 26.  Defendants cannot now articulate a
22 compelling interest in subjecting FFI's operation of the Hotline to these unrelated
23 requirements.

24      Defendants have not articulated why their second explanation—that ICE shut
25 down the Hotline because FFI facilitated three-way calls—would be any more
26 compelling of an interest.  The Hotline, along with other numbers on ICE's free
27 telephone platform, was used to connect with immigrants in detention.  Those
28

1  immigrants speak many different languages.  Three-way calls could, for example,
2  facilitate communication across language barriers by permitting an interpreter to join.

3          **b)      Termination of the Hotline Is Not Narrowly Tailored**

4          Defendants' termination of the Hotline is not narrowly tailored because it is
5  both underinclusive and overinclusive.  If Defendants truly hold a compelling
6  interest in ensuring that organizations operating on ICE's platform appear on the
7  EOIR list, they would not continue to permit an organization not appearing on that
8  list to maintain an extension nor would they have allowed FFI's Hotline to operate
9  for several years without appearing on the list.  FFI Decl. ¶ 26.  Thus, Defendants'
10  policy is underinclusive, which "raises serious doubts about whether the government
11  is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker
12  or viewpoint."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

13          Construed as an effort to limit three-way calling, Defendants' shut down of the
14  Hotline is patently overinclusive.  "To satisfy the narrow tailoring requirement, 'the
15  Government . . . bears the burden of showing that the remedy it has adopted does not
16  burden substantially more speech than is necessary to further the government's
17  legitimate interests.'"  *Comite de Jornaleros de Redondo Beach v. City of Redondo*
18  *Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc) (quoting *Turner Broad. Sys., Inc.*
19  *v. FCC*, 512 U.S. 622, 665 (1994) (internal quotation marks omitted)).  If Defendants
20  wished to restrict three-way calls on the free and confidential platform, they could
21  have done so as a simple technical measure, or through adequate notice and fines—
22  not by blocking the Hotline entirely.  *See Nw. Immigrant Rights Project*, 2017 WL
23  3189032 at *4 ("[T]he Government has failed to advance any substantial regulatory
24  interest, in the form of substantive evils flowing from NWIRP's activities, which can
25  justify the broad prohibitions which it has imposed.").

26

27

28

## II.   **FFI and Detained Immigrants Will Suffer Irreparable Harm Without Injunctive Relief.**

"[The Ninth Circuit] and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein*, 584 F.3d at 1207-08 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "In First Amendment cases, the presumption in favor of irreparable harm is particularly strong . . . ." *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1300 (C.D. Cal. 2008). That this "case raises serious First Amendment questions compels a finding that there exists 'the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [FFI's] favor.'" *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (citation omitted).

## III.   **The Balance of Equities and Public Interest Favor FFI.**

"When the government is a party, [the balance of equities and public interest] factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The balance of equities is sharply in FFI's favor. Beyond depriving FFI and detained immigrants of their constitutional rights, Defendants' shutdown of the Hotline frustrates the reporting of abuse by detained immigrants, as well as FFI's ability to carry out its mission. Because detained immigrants are routinely deported, certain persons may never be able to speak with FFI or vice versa. Moreover, because FFI must divert its resources as a result of the Hotline's shutdown, the organization's other projects suffer. *See* FFI Decl. ¶¶ 28-29. Defendants, on the other hand, would suffer no hardship in reinstating the free Hotline. The requested injunctive relief would only restore the status quo in place since ICE granted the extension in 2013.

The public interest factor also weighs strongly in favor of granting injunctive relief. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d at 583 (quoting

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

*Sammartano*, 303 F.3d at 974); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Without injunctive relief, the public will be deprived of one of the few sources of independent information regarding this important national issue. *See IBiz, LLC v. City of Hayward*, 962 F. Supp. 2d 1159, 1170 (N.D. Cal. 2013) (noting that "the enforcement of an ordinance that violates the First Amendment would infringe the rights of many members of the public not currently before the Court"). An injunction preserving the flow of information to the public will serve the core First Amendment purpose of "assur[ing] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co.*, 376 U.S. at 269 (citation omitted).

## **CONCLUSION**

The First Amendment does not countenance retaliation for speech nor does it permit the government to restrict or burden speech based on its contents or the views of its speaker without satisfying exacting scrutiny. FFI has for too long been subject to ICE's ire for drawing attention to immigration detention and, through public advocacy, improving the lives of those in detention. FFI should not have to operate under constant threat that, in response to a disfavored article or protest, ICE may impede, inhibit, or interfere with its work. The Court should grant FFI's application for a preliminary injunction enjoining and restraining Defendants from further interference with FFI and detained immigrants' use of the Hotline, and restoring the Hotline at all detention facilities operated, controlled, and overseen by ICE until the constitutionality and legality of Defendants' actions can be finally adjudicated.

NOTICE OF APPLICATION AND APPLICATION FOR PRELIMINARY INJUNCTION

Dated:  December 10, 2019

By:  _____
    Moez M. Kaba
    Rajan S. Trehan
    Ashley M. Artmann
    Attorneys for Plaintiff
    Freedom for Immigrants