UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREEDOM FOR IMMIGRANTS,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>Defendants. | Case No. 2:19-cv-10424-AB (GJSx)<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

## I. INTRODUCTION

Before the Court is Plaintiff Freedom for Immigrants' ("FFI") motion for a preliminary injunction. (Dkt. No. 4.) Defendants U.S. Department of Homeland Security, U.S. Immigration & Customs Enforcement, Chad F. Wolf, Matthew T. Albence, and Derek N. Benner (collectively "DHS") oppose FFI's motion. (Dkt. No. 22.) The Court heard oral argument regarding FFI's motion on January 31, 2020. For the reasons stated below, the Court **GRANTS** FFI's motion for preliminary injunctive relief. The Court also **GRANTS** DHS's ex parte application for leave to file a sur-reply, and considers the additional evidence submitted both by DHS and FFI in relation to this application. (Dkt. Nos. 24, 25.)

//

1.

## II. BACKGROUND

This case concerns the shutdown of FFI's free and confidential National Immigration Detention Hotline (the "Hotline") by DHS, allegedly in retaliation for FFI's advocacy on behalf of detained immigrants who report abuse by DHS officials.

In 2013, FFI and Friends of Miami Dade Detainees ("FOMDD") requested and received a telephone extension number (*9233#) that operated on U.S. Immigration and Customs Enforcement's ("ICE") free and confidential national telephone program. (Dkt. No. 4-8 at ¶ 6.) DHS contests that FFI ever requested or received this telephone extension, stating by declaration that "[w]hen ICE initially issued extension 9233 [in November 2013], Freedom for Immigrants was not mentioned." (Dkt. No. 22-1 at ¶ 13). However, FFI presents evidence that around October 2013, when FFI and FOMDD allegedly sought approval of the Hotline, FFI was known as Community Initiatives for Visiting Immigrants in Confinement ("CIVIC"). (*See* Dkt. No. 4-2 at pp. 4–6). FFI also presents evidence that FFI and FOMDD jointly sought approval of the Hotline, and that FOMDD is and was an affiliate organization of FFI. (Dkt. No. 4-8 at ¶ 6; Dkt. No. 23-1 at ¶¶ 5–7); (*see also* Dkt. No. 25-2 at 2)  FFI further shows that the Hotline, since its inception, has been operated and supervised by FFI and staffed by FFI volunteers. (Dkt. No. 23-1 at ¶ 7.)

Through use of the Hotline, immigrants in any ICE detention center could call FFI at no charge. (Dkt. No. 4-8 at ¶ 7.) The Hotline, as a part of ICE's free and confidential national telephone program, was not monitored by government officials. *Id.* Through the Hotline, detained immigrants reported abuse and mistreatment by DHS officials to FFI, and FFI helped immigrants file complaints with DHS's Office of Civil Rights and Civil Liberties. *Id.* ¶ 9. FFI also helped detained immigrants obtain other services, including the ability to locate separated family members. *Id.* ¶ 10.  In January and February 2017, the Hotline received over 11,000 calls and 10,000 calls, respectively. *Id.* ¶ 8.

//

From 2013 to 2019, FFI publicly criticized ICE's treatment of detained immigrants, and allegedly suffered various forms of retaliation. For example, in July 2013, FFI's Co-Founder and Co-Executive Director published an article in *The Huffington Post* criticizing the treatment of gay and transgender detained immigrants in the Santa Ana City Jail. *Id.* ¶ 13; *see also* Dkt. No. 4-2. Within 48 hours, ICE had temporarily shut down FFI's visitation program at the Santa Ana City Jail, and had temporarily blacklisted certain FFI members from visiting detainees at the Adelanto Detention Facility. (Dkt. No. 4-8 at ¶ 13.) Similarly, in summer 2013, an FFI network member told ICE about alleged sexual assault, harassment, and neglect of detainees at Otay Detention Center in San Diego. *Id.* ¶ 14. ICE temporarily shut down the FFI network member's visitation program in August of that year. *Id.* In August 2014, the visitation program coordinator for an FFI network member testified at a Florida state congressional hearing, criticizing ICE's treatment of detainees at the Broward Transitional Center and Krome Service Processing Center. *Id.* ¶ 15. A few days after this testimony, ICE temporarily shut down the visitation program at Broward. *Id.* Later, in summer 2018, ICE shut down an FFI affiliate's visitation program at the Otay Detention Center in San Diego, following FFI's work to help reunite separated immigrant families. *Id.* ¶ 19. On November 3, 2019, members of FFI and its affiliates participated in a protest outside of the Etowah County Detention Center in Alabama. *Id.* ¶ 21. Less than 48 hours later, ICE indefinitely suspended an FFI affiliate's visitation program. *Id.*

This retaliation campaign by DHS allegedly extended to the Hotline. In particular, ICE restricted the Hotline from its nationwide reach to eight detention facilities in Florida, one month after FFI sent ICE and DHS's Office of Civil Rights and Civil Liberties a letter regarding the termination of its visitation program at the Otay Detention Center. *Id.* ¶¶ 22–23. DHS contends that this geographical restriction came as the result of a system-wide update to limit pro bono hotlines to only those areas where particular organizations were located. (Dkt. No. 22-1 at ¶ 17.) However,

DHS does not provide any explanation for why this geographic limitation was imposed.[1] *Id.*

After DHS imposed this geographic restriction on the Hotline, FFI members became involved with the writers and producers of Season 7 of *Orange is the New Black* ("*OITNB*"). (Dkt. No. 4-8 at ¶ 25.) Season 7 of the show prominently features FFI as a hotline for detained immigrants, and portrays detainees passing around FFI's hotline in secret to avoid detection by ICE. (Dkt. No. 4 at 17). The season, including FFI's involvement, received extensive media coverage. (Dkt. No. 4-8 at ¶ 25).

Within two weeks of the season premiere, on August 7, 2019, FFI stopped receiving calls on the Hotline. *Id.* ¶ 26. When FFI and FOMDD contacted ICE to see why the Hotline had been shut down, they were informed that the Hotline had been removed as part of a standardization process. *Id.* DHS states that in summer 2019, it decided to allow Hotlines only for those organizations identified on the Executive Office for Immigration Review ("EOIR") List of Pro Bono Legal Service Providers. (Dkt. No. 22-1 at ¶ 18.) DHS states that because FOMDD was not on the EOIR list, its Hotline was shut down. *Id.* ¶ 19. Moreover, DHS states that "Talton Communications provided information that the extension 9233 was engaged in call forwarding and/or three-way calling," which posed a security risk. *Id.* However, DHS does not provide any information in this declaration as to when this information as to call forwarding or three-way calling was provided to DHS, or as to why it decided to allow Hotlines only for those on EOIR's list. In fact, evidence produced by DHS suggests that DHS was aware of call forwarding by the Hotline as early as December 2013, years before DHS decided to shutdown the Hotline. (Dkt. No. 24-3.)

//

---

[1] At the January 31, 2020 hearing on this motion, DHS contended for the first time that the Hotline was restricted from its nationwide outreach to Florida after DHS discovered a technical glitch. However, DHS has provided no evidence, whether in the form of a declaration or otherwise, in support of this assertion.

4.

Because its Hotline has been shut down, FFI has been forced to incur numerous additional expenses to continue its mission. In particular, FFI created phone accounts at detention facilities and deposited money into those accounts to allow detained immigrants to contact FFI at no cost. *Id*. ¶ 29. FFI notes that these calls can cost over $1 per minute, rather than the free Hotline it had previously maintained. *Id.* In addition to requiring payment, FFI's new phone accounts are no longer confidential. *Id*. ¶ 30. FFI contends that this discourages detainees from reporting abuse and mistreatment. *Id.*

Based on the above, FFI brings the present preliminary injunction motion to compel DHS to restore FFI's hotline in all ICE detention facilities.

### III. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008) (alterations added). The first factor, likelihood of success on the merits, is a threshold inquiry. *See Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("[W]hen a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [factors]") (internal quotation marks omitted) (alterations added).

### IV. DISCUSSION

**1. FFI has established a likelihood of success on the merits**

First, FFI has established a likelihood of success on the merits of its First Amendment retaliation claim.

A First Amendment retaliation claim requires that the plaintiff show "that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's

5.

conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech."[2] *Ariz. Students' Assoc. v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

DHS first contends that FFI lacks standing to bring its First Amendment retaliation claim. Here, because FFI brings suit on its own behalf as an organization, it must demonstrate (1) injury in fact (i.e. a concrete and particularized invasion of a legally protected interest), (2) causation (i.e. a fairly traceable connection between the alleged injury and the alleged conduct of defendant), and (3) redressability (i.e. a likelihood that the plaintiff's injury will be remedied by the relief plaintiff seeks). *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (holding that the same analysis is used to determine whether an organizational plaintiff has standing in a particular case as is used for individual plaintiffs) "An organization suing on its own behalf can establish injury when it suffered 'both a diversion of resources and a frustration of its mission.'" *Id.* (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).

Here, FFI demonstrates injury, as it shows that shutting down its Hotline frustrated its mission of reporting on conditions of confinement in ICE detention facilities, and forced FFI to divert financial resources to pay $1 per minute for telephone calls with immigrant detainees. *See supra*. DHS contends that FFI cannot show injury in fact, because FFI was not the organization actually assigned the

---

[2] As an initial matter, the Court rejects DHS's argument that the standard for First Amendment retaliation claims within the prison context applies here. *See* Dkt. No. 22 at 14. DHS provides no authority extending this heightened standard to civil immigration detention. *Id.* at 14–18. Moreover, because detention of immigrants by DHS is civil confinement, not criminal confinement, "we assume that [it] [is] nonpunitive in purpose and effect." *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Finally, in this case, FFI does not bring a First Amendment retaliation claim as a prisoner, but rather as a non-profit organization seeking to maintain its ability to communicate freely and confidentially with detained immigrants. Accordingly, the Court concludes that the heightened standard for First Amendment retaliation claims in the prison context does not apply.

1 Hotline number. However, as the Court noted above, DHS has not shown that CIVIC, FFI's name at the time of its application, did not have access to the Hotline. Further, DHS has failed to rebut FFI's evidence that it was an affiliate organization of FOMDD, which indisputably had access to the Hotline. *See supra.* Because FFI demonstrates that shutting down the Hotline caused it to divert financial resources and frustrated FFI's mission, FFI shows injury in fact.

Second, FFI has demonstrated both causation and redressability. As to causation, FFI has shown that its injury is fairly traceable to DHS's conduct in shutting down the Hotline. As to redressability, FFI has shown that its injury will likely be remedied by an injunction reinstating the Hotline. Because FFI has demonstrated (1) injury in fact, (2) causation, and (3) redressability, it has standing to pursue its First Amendment retaliation claim.

As to the merits of FFI's retaliation claim, DHS concedes, as it must, that FFI has engaged in conduct protected under the First Amendment. (Dkt. No. 22 at 15); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("[S]peech on matter of public concern . . . is at the heart of First Amendment protection.") (internal quotation marks omitted) (alterations in original). As to the second element for First Amendment retaliation, FFI has shown that DHS's conduct would chill a person of ordinary firmness from continuing to engage in protected activity. In particular, FFI has shown that detained immigrants seeking to call FFI from ICE detention facilities now incur a $1 per minute charge that was not imposed with the Hotline. Moreover, FFI has shown that detained immigrants must now call FFI on monitored communications lines, rather than on the Hotline's confidential line. *See supra.* This evidence is sufficient to show that DHS's conduct in shutting down the Hotline would chill a person of ordinary firmness from continuing to engage in protected activity. *See Ariz. Students Assoc.*, 824 F.3d at 868 ("Both the Supreme Court and we have recognized . . . [that] the government may chill speech by threatening or causing pecuniary harm.").

7.

With respect to the third element for First Amendment retaliation, FFI has shown that its speech was a substantial and motivating factor behind DHS's shutdown of the Hotline. A plaintiff can demonstrate that its speech was a substantial and motivating factor behind the government's retaliation by demonstrating, among other things, (1) a close proximity in time between the speech and the retaliatory conduct, and (2) that the government's proffered reasons are pretextual. *See Anthoine v. N. Cent. Ctys Consortium*, 605 F.3d 740, 750–51 (9th Cir. 2010). Here, FFI provides evidence that DHS restricted the Hotline to Florida approximately one month after FFI petitioned ICE and DHS's Office of Civil Rights and Civil Liberties to reopen its visitation program in Otay. *See Supra*. FFI also provides evidence that its Hotline was shut down within two weeks of the season premiere of *OITNB* featuring FFI's Hotline in immigration detention centers. *Id.* In addition to this evidence, FFI shows a litany of retaliatory acts by DHS in response to FFI's public advocacy from 2013 to 2019. (*See generally*, Dkt. No. 4-8). This history of retaliatory conduct by DHS, in addition to DHS's failure to explain *why* it undertook the actions that had the effect of limiting and ultimately shutting down FFI's Hotline, suggests that DHS's proffered explanations are pretextual. This close proximity in time and evidence showing pretext firmly support the conclusion that FFI has made a prima facie showing of retaliatory intent, and that DHS has failed to rebut that presumption. *Cf. Hartman v. Moore*, 547 U.S. 250, 260 (2006). FFI has accordingly shown that it is likely to prevail on the third element of its First Amendment retaliation claim.

Because FFI has demonstrated that it has organizational standing, and because its evidence shows the DHS has likely retaliated against FFI for its exercise of First Amendment rights, FFI has demonstrated a likelihood of success on the merits.

**2. FFI has shown irreparable harm in the absence of preliminary relief**

As FFI correctly argues, both the Supreme Court and the Ninth Circuit "have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San*

8.

*Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That there exists an approximately four-month period between DHS's shutdown of the Hotline and FFI's filing suit does not change this irreparable harm analysis, as any continued deprivation of First Amendment harm remains irreparable. *Cf. Id.* (holding that where a plaintiff seeks to engage in political speech, "[a] delay of even a day or two may be intolerable[.]") (second alteration added).

Because FFI has demonstrated that DHS's conduct likely contravenes its First Amendment rights, FFI satisfies the irreparable harm requirement for preliminary injunctive relief.

### 3. The balance of equities and public interest favor issuance of a preliminary injunction

Where, as here, the government is a party to a preliminary injunction motion, the last two factors—the balance of equities and whether an injunction is in the public interest—merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). FFI argues that the balance of equities and public interest tip in its favor because shutting down the Hotline makes it harder for detained immigrants to report abuse by DHS officials, and that DHS would suffer no hardship because it previously allowed the Hotline since 2013. (Dkt. No. 4 at 32.) In turn, DHS argues that the equities and public interest weigh in its favor because it shut down the Hotline to ensure the safety of detainees and maintain order. (Dkt. No. 22 at 20.)

The evidence provided to the Court shows that the balance of equities and public interest are in FFI's favor. In particular, FFI's evidence shows that shutting down the Hotline has resulted in marked hurdles for those seeking to confidentially report abuse by DHS officials to FFI. *See generally*, Dkt. No. 4-8. By contrast, the evidence provided by DHS is insufficient to show that the Hotline posed a security risk outweighing the interest of detainees to report abuse, as there is no indication as to when or how frequently the extension engaged in call forwarding or three-way calling. (*See* Dkt. No. 22-1 at ¶ 19).

9.

Because the balance of the equities and public interest weigh in FFI's favor, FFI satisfies the final elements for preliminary injunctive relief.

### 4. FFI's requested scope of preliminary injunctive relief is proper

DHS contends that even if FFI is entitled to preliminary injunctive relief, the scope of any such injunction should be limited to ICE detention facilities in Florida, as nationwide preliminary injunctions are disfavored. (Dkt. No. 22 at 20–21.)

As a general matter, a preliminary injunction "must be narrowly tailored to remedy the specific harm shown." *City and Cty of San Fran. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). Here, FFI requests injunctive relief restoring the Hotline throughout all ICE detention centers in the United States, based on it showing that the harm it suffered comprises both (1) retaliation by DHS in restricting the geographic reach of the Hotline to ICE detention facilities in Florida, and (2) retaliation by DHS in shutting down the Hotline entirely. FFI provides evidence that prior to these alleged retaliatory acts, the Hotline was available to all immigrant detainees in all ICE detention centers in the United States. (*See* Dkt. No. 4-8 at ¶ 7). Because FFI's alleged harm occurred in all ICE detention centers throughout the United States, an injunction applying to all ICE detention centers is necessary to remedy FFI's injury. Moreover, DHS's argument that this is necessarily a disfavored nationwide injunction that applies to non-parties is unavailing. Here, FFI does not seek to "order[] the government to take . . . some action with respect to those who are strangers to the suit." *See DHS v. New York*, 589 U.S. ___ (2020) (Gorsuch, J., concurring). Rather, FFI seeks a preliminary injunction "no broader and no narrower than necessary to redress the injury shown by [FFI]." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).

Because FFI's requested preliminary injunctive relief is no broader and no narrower than necessary to redress FFI's alleged injury from DHS's retaliatory acts, the Court finds the scope of requested relief appropriate.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** FFI's motion for a preliminary injunction. The Court also **GRANTS** DHS's ex parte application for leave to file a sur-reply. The Court accordingly **ORDERS** that Defendants U.S. Department of Homeland Security, Chad F. Wolf, U.S. Immigration & Customs Enforcement, Matthew T. Albence, and Derek N. Benner are

1. **ENJOINED AND RESTRAINED** from further interference with the operation of the free and confidential extension used by Freedom for Immigrants and Friends of Miami Dade Detainees as a hotline for communicating with immigrants in detention; and
2. **ORDERED** to restore Freedom for Immigrants and Friends of Miami Dade Detainees' free and confidential extension at all detention facilities operated, controlled, and/or overseen by U.S. Immigration & Customs Enforcement, until such time as the Court renders a final judgment on the merits of this action.

**IT IS SO ORDERED.**

Dated: February 11, 2020  _____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE